J-S04040-17

2017 PA Super 82

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PADGE VICTORIA WINDSLOWE | : | |
| A/K/A PAGE V. GORDON | : | |
| | : | No. 2126 EDA 2015 |
| Appellant | : | |

Appeal from the Judgment of Sentence June 11, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0005870-2012,
CP-51-CR-0012090-2012

BEFORE:  SHOGAN, OTT and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED MARCH 28, 2017**

Appellant Padge Victoria Windslowe (a/k/a Page V. Gordon) appeals the judgment of sentence entered after a jury convicted Appellant of third-degree murder, aggravated assault, and possessing instruments of crime.[1] Appellant challenges the sufficiency and weight of the evidence, claims the trial court abused its discretion in admitting certain evidence, and contends the trial court should have declared a mistrial.  We affirm.

Appellant was charged with the murder of Claudia Aderotimi and the aggravated assault of Sherkeeia King, two women who were hospitalized after hiring Appellant to perform an illicit cosmetic procedure in which Appellant injected silicone into their buttocks.  To entice the victims,

---

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S. §§ 2502(c), 2702, 907(b), respectively.

Appellant falsely advertised herself as a medical professional trained to perform a buttocks enhancement procedure accepted by the medical community as safe and effective. While King sustained permanent damage to her lungs, heart, and buttocks, Aderotimi did not survive.

After Appellant's jury trial commenced on February 19, 2016, the prosecution presented several days of testimony to develop its case. We summarize the relevant details of this extensive factual background.

*Death of Claudia Aderotimi*

The Commonwealth's case centered on the untimely death of Aderotimi, a twenty-year old British woman, who was rushed for emergency care on the eve of February 7, 2011. Aderotimi passed away just hours later at 1:32 a.m. on February 8, 2011, at Mercy Philadelphia Hospital. Dr. Fredrick Hellman, Delaware County Chief Medical Examiner, performed Aderotimi's autopsy and observed numerous injection sites in her buttocks that were leaking clear, thick fluid. He discovered silicone in Aderotimi's blood, stomach, urine, liver, lung tissue, and brain tissue. As a result, Dr. Hellman concluded Aderotimi's cause of death was a pulmonary embolism caused by silicone injections into the buttocks and opined that her manner of death was homicide.

The prosecution's expert in plastic surgery, Dr. Robert Noone, agreed with the medical examiner's conclusion that Aderotimi died from a massive pulmonary embolism, which occurred when the silicone injections entered Aderotimi's blood stream, traveled to the lungs, and stopped Aderotimi's

heart. Stressing that the injection of silicone is not an acceptable medical procedure to enlarge a patient's buttocks, Dr. Noone clarified that there are only three approved methods of buttocks sculpting; reshaping the buttocks with the patient's own tissue; aspirating the patient's abdomen fat, purifying the fat, and injecting the fat into the buttocks; or inserting a prefabricated buttocks implant that is similar to a breast implant. However, Dr. Noone stressed that these procedures must be performed under anesthesia by accredited physicians in accredited medical facilities.[2]

Scheffee Wilson and Theresa Gyamfi testified that they witnessed Appellant give Aderotimi silicone injections into her buttocks on February 7, 2011, just hours before Aderotimi's death. By way of background, Wilson explained that she had met Appellant years earlier in June 2008 when she sought a "butt enhancement" for herself online by placing her contact information on a blog called "Topix"; Appellant responded under the names "Lillian" and "Body by Lillian," and offered to perform silicone injections. N.T., 2/19/15, at 204-206. Appellant sent Ms. Wilson a detailed email with exclusive sale prices, which she asked that Ms. Wilson not share with

_____

[2] Dr. Noone noted a limited exception as Adato Sil-Ol, a silicone product, is used by ophthalmologists to treat retinal displacement. However, Dr. Noone emphasized that only a small volume of about ten cubic centimeters (10 cc) of Adato Sil-Ol is injected into the eye and is aspirated out of the body once the retina heals. In comparison, Appellant would inject a range of 1000 to 2000 cc silicone into a customer's buttocks in one session and would again inject similar volumes in subsequent sessions.

anyone. She offered several packages of different products with varying effectiveness in which she promised to inject Ms. Wilson with volumes of 1500 to 2000 cc of silicone product, listing prices ranging from $1,500.00 to $3,700.00. In the email, Appellant represented that she was a physician's assistant with ten years' experience and guaranteed her results.

After receiving several rounds of injections, Wilson became Appellant's "business partner," finding Appellant customers in exchange for a referral fee. N.T., 2/19/15, at 224-30. Wilson could not contact Appellant directly; she would email her and Appellant would call back from a blocked number. Appellant utilized several email addresses: BodyByLillian@yahoo.com, buttocksculpture@yahoo.com, and miamiplasticsurgery@yahoo.com. Wilson indicated that Appellant implied she worked for a plastic surgeon when she talked about her experience and training. When Appellant was late to inject someone, she would say that "something happened at the clinic [or] the doctor's office." N.T., 2/19/15, at 217.

Wilson arranged for Appellant to meet Aderotimi and Gyamfi, two British women interested in a buttocks enhancement procedure. Wilson directed Aderotimi and Gyamfi to book a hotel room in Philadelphia in November 2010. Appellant met the women in their hotel room, injected each of them with 1800 cc of silicone, closed the injection sites with Krazy Glue and cotton balls, and instructed them to lie on their stomachs for a few hours. The women each paid Appellant $1,800.00 cash.

Aderotimi and Gyamfi returned to Philadelphia for "touch up" injections and contacted Wilson to meet Appellant at the same hotel on February 7, 2011, the eve of Aderotimi's death. N.T., 2/26/15, at 74-81. Wilson also arranged to get a separate hotel room as she had developed a lump in her buttocks from the silicone injections; Appellant had been trying to fix the lump by injecting more silicone and attempting to withdraw some of the silicone she had previously injected.

All four women gathered in the Aderotimi and Gyamfi's hotel room to begin the process. At the moment Appellant administered Aderotimi's final injection of silicone, Wilson and Gyamfi watched as Aderotimi's body "jolted." N.T., 2/19/15, at 243-45. Aderotimi seemed to recover and Appellant proceeded to inject Gyamfi and Wilson. Aderotimi began to complain of chest pains and asserted that it hurt to breathe ever since she received the last injection. When Aderotimi's pain brought her to tears, Appellant placed her hand on Aderotimi's chest and asked if this pressure hurt. Aderotimi explained again that she had pain every time she breathed in. After Appellant instructed Aderotimi to call an ambulance if the pain worsened, she "made haste" and left the hotel. N.T., 2/19/15, at 247-48.

As Aderotimi's pain increased and she began gasping for air, Wilson called 9-1-1. Gyamfi told the emergency personnel that Aderotimi had just received silicone buttocks injections. Although the paramedics gave Aderotimi oxygen and transported her to the hospital, Aderotimi died several hours later. Wilson called Gyamfi to check on Aderotimi and learned of her

death. Wilson attempted to contact Appellant, who returned her call from a blocked number. When Wilson told Appellant that Aderotimi had died, Appellant hung up the phone. Wilson never heard from Appellant again.

Wilson cooperated with the detectives investigating Aderotimi's death and gave her account of her involvement with "Lillian." Although Wilson did not know Appellant's real identity, she knew Appellant recorded a rap music video under the moniker "Black Madam," which was available on YouTube. Officers met with the video producers who identified Appellant as Padge-Victoria Windslowe and indicated that Appellant had two Pennsylvania addresses: one in Narberth and one in Ardmore.

The investigating officers ran Appellant's Pennsylvania driver's license and confirmed that her 2002 Jaguar was registered at the same address in Narberth. The officers obtained a search warrant for both addresses, but Appellant was not present at either location and their eventual searches did not provide additional information on Appellant's whereabouts.

*Subsequent Injury of Sherkeeia King*

While Appellant initially avoided being arrested for Aderotimi's murder, she was eventually apprehended in connection with the police investigation into subsequent allegations of Appellant's assault of Sherkeeia King. In January 2011, King had initially met Appellant at a party hosted at the home of Sharnell Saunders, where several women arranged to get buttocks enhancement injections. Appellant identified herself as "Lillian," a registered nurse in the cosmetology field trained to administer medical-grade silicone

injections from Thailand. N.T., 2/23/15, at 114-16. Appellant injected the women with silicone, closed the injection sites with Krazy Glue and cotton balls, and instructed the women to drink plenty of water and to avoid sitting for an extended period of time. King paid Appellant $1,000.00 for a "Dixie cup" of silicone. N.T., 2/23/15, at 117-22.

After receiving these injections, King and Saunders learned of Aderotimi's death, which had been linked to illegal silicone buttocks injections. Saunders then attempted to contact Appellant to see if Appellant had administered Aderotimi's injections. Appellant did not return Saunders's calls and Appellant's phone number was eventually disconnected. About a year after Aderotimi's death, Saunders heard that Appellant had resurfaced and was back in business. Saunders obtained Appellant's new number and sought to schedule another injection round.

Appellant called back from a blocked number, indicating she was willing to do injections for a former customer, and asserted she would explain the circumstances of Aderotimi's death in person. Appellant arranged to give silicone injections to both Saunders and King at Saunders's Philadelphia home on separate occasions. When questioned by both women about Aderotimi's death, Appellant alleged that Aderotimi was high on cocaine, died of an overdose, and did not follow Appellant's aftercare instructions. Both Saunders and King believed Appellant's explanation and paid her to perform additional silicone buttocks injections.

King received her injections on February 19, 2012, at Saunders's home. As Appellant injected King with silicone, King felt "funny" and her leg began to shake. N.T., 2/23/15, at 128. Appellant told King her buttocks was stretching as she was getting more silicone in this round. After returning home, King's temperature reached 109 °F and she began coughing up blood. King was admitted to the Lankenau Hospital intensive care unit where she remained on a breathing machine for approximately twenty days. Dr. Arka Banerjee, King's supervising physician, testified that CAT scans showed King sustained heart and lung damage consistent with a silicone pulmonary embolism, which cannot be treated with surgery or medication. King was discharged from the hospital with level three heart disease and was required to use an oxygen tank for three additional weeks. King still has trouble breathing and cannot sit for an extended period of time.

Saunders assisted homicide detectives in apprehending Appellant by setting up another appointment with Appellant at her home on February 29, 2012. In advance of this operation, the officers obtained a warrant for Appellant's arrest and a search warrant for Saunders's home. When Appellant arrived at Saunders' home on that day, she was placed under arrest. Officers recovered Appellant's pink bag, which contained various items used for illegal silicone injections: rubber gloves, Krazy Glue, markers, syringes, needles, cotton balls, trash bags, plastic cups, and bottles containing unknown clear substances.

The detectives obtained a search warrant for the Nissan Sentra that Appellant drove to Saunders's home. Inside the car, the detectives found credit cards and mail in Appellant's name and in several of her aliases. The mail was directed to a home in Chesterbrook, Pennsylvania. Based on this information, the officers were able to obtain and serve a search warrant on Appellant's Chesterbrook home. Officers recovered a packing slip dated March 29, 2010, and a specification sheet from Neely Industries, Inc. for the product Xiameter, which is an industrial grade silicone used to manufacture auto wax, shampoo, lubricant, or damping fluid. In addition, officers confiscated additional injection supplies, four cell phones, and newspaper clippings reporting on Aderotimi's death.

Dr. Adam Lanzarotta of the FDA Forensic Chemistry Center analyzed the clear liquids found at Appellant's Chesterbrook home and in her possession upon her arrest. All of the bottles tested positive for silicone and two of the bottles were labeled "not for injection via intravenously" and "Rx only." N.T., 2/24/15, at 102-108. Special Agent Michael Widenhouse, a criminal investigator for the FDA, testified that Xiameter is industrial silicone manufactured by Dow Corning and available through wholesalers like Neely Industries. Widenhouse explained that the FDA does not regulate Xiameter because it is not intended for human consumption.

*Prior Injury to Melissa Lisath*

At trial, the Commonwealth was permitted to introduce evidence that, prior to her injection of Aderotimi and King, Appellant also caused harm to

- 9 -

Melissa Lisath with her silicone injections in 2008. Although Appellant was never charged with the assault of Lisath, the trial court agreed with the Commonwealth's assertion that these circumstances were admissible under Pennsylvania Rule of Evidence 404(b) to show Appellant had knowledge that silicone injections were unsafe.

Years before meeting Aderotimi and King, Appellant had arranged online to perform similar injection procedures on Stephanie Matos and her friend, Melissa Lisath, in August 2008 at a Philadelphia hotel. Appellant informed the women that her name was "Lillian" and that she was a "nurse practitioner who worked for a plastic surgeon." N.T., 2/20/15, at 5-8. Appellant injected the women with silicone, covered the injection sites with Krazy Glue and cotton balls, and told them not to sit for twenty-four hours.

Lisath asked Appellant to perform a second round of injections in September 2008; Lisath paid Appellant $700.00 for 1000 cc of silicone to be injected in her buttocks and thighs. Lisath testified she felt lightheaded and short of breath once she received the injections. After returning home to New York, Lisath woke up in the emergency room, was hospitalized for three months with a breathing tube, and was in a coma for a portion of that time. Lisath's injuries prevented her from being able to work for several years and she testified that the silicone has created lumps in her buttocks.

After Lisath's hospitalization, Matos tried unsuccessfully to contact Appellant, who would not answer Matos's emails or phone calls. Matos testified that before Lisath's injury, Appellant would return her phone calls

and email messages right away. However, after Lisath was injured, Matos felt like Appellant had "disappeared." N.T., 2/18/15, at 25. Matos then returned to the blog where she found Appellant's information, warned its readers of the danger of Appellant's silicone injections, and shared the details of Lisath's injury from the injection. After Matos made these posts, she noticed that "Body by Lillian" could no longer be found on the blogs.

*Appellant's Testimony*

Testifying in her own defense, Appellant indicated she was born Forest Leon Gordon, changed her name to Padge-Victoria Windslowe in 1992, and had gender reassignment surgery in 1994. Appellant claimed she was properly trained to administer silicone injections in 1994 or 1995 from a nurse named Natasha Rodriguez in her apartment in Washington Heights, New York; Appellant alleged that Dr. Chim Choke of Thailand taught her how to mix lidocaine with adrenaline to use for numbing purposes. When the prosecutor asked if Appellant told her customers that she received "back-street" training, Appellant claimed "in the transgender world, we don't always do things the conventional way [as there] is no path for us to do it." N.T., 2/27/15, at 90. Appellant denied that she ever told her customers she was a nurse or a medically trained professional.

Appellant offered clients three different silicone products: (1) Adato Sil-Ol, which she acquired from "Dr. Voo" in Thailand; (2) Silikon 1000, which she acquired from Natasha Rodriguez; and (3) a product Appellant called "hydrogel," which Appellant would make herself by mixing Xiameter

and saline solution (in a "$^1/_3$ to $^3/_4$ ratio")[3] in her kitchen blender. Appellant used a bottle crimper to make her silicone concoction look like a legitimate medical product. Under the alias "Hillmont GI," Appellant purchased over 58 gallons of Xiameter from Neely Industries, Inc.; Appellant believed she needed to be associated with a medical group to buy this product.

Despite ordering large amounts of Xiameter, Appellant denied receiving Xiameter packing slips found in her home that stated that Xiameter was a food grade product "neither tested nor represented as suitable for medical or pharmaceutical uses, not intended for human injection, not intended for food use."[4] N.T., 2/27/15, at 64, 76-77. Appellant later admitted to receiving the slips but "knew what was coming… [and] knew it was safe." N.T., 2/27/15, at 148-51. She argued that Natasha Rodriguez and "Kevin" from Neely Industries assured her Xiameter was non-toxic and acceptable for humans to eat and drink. N.T., 2/27/15, at 147. In response, the Commonwealth offered the rebuttal testimony of Kevin Trawick and David Laakso, employees of Neely Industries, who denied telling any customer it was safe for humans to ingest Xiameter.

_____

[3] It is mathematically impossible to make a mixture using this ratio; the addition of these two fractions equals $^{13}/_{12}$ or 108%.
[4] Derek Crump, the vice-president and general manager of Neely Industries, testified that Xiameter is designated "food-grade" silicone, as it is often used as a lubricant on conveyor belts and may have incidental contact with food product in the food industry.

Appellant testified that she was aware that silicone should not be injected into a vein, but felt it was acceptable to inject silicone into fatty tissue. She admitted to employing the procedure described by the prosecution's witnesses: measuring each buttocks with a ruler, marking injection sites with a Sharpie marker, injecting Lidocaine and adrenaline to numb the area, injecting silicone, and closing the injection sites with Krazy Glue and cotton balls. She claimed that everything was sterile because she used latex gloves, kept her silicone products in water bottles, and dumped her injection materials into a medical dumpster. Appellant asserted that she received the silicone injections herself.

Appellant conceded that she injected Aderotimi in November 2010 and on the eve of Aderotimi's death on February 7, 2011. Appellant felt that Aderotimi's complaint of a "tickle" in her throat and complications from her final injection were caused by Aderotimi's consumption of Four Loko, a malt liquor beverage with caffeine. Appellant denied that Aderotimi complained of chest pains or trouble breathing. Appellant claimed that after leaving the hotel, she called Wilson "every hour on the hour" to check on Aderotimi and learned of her death on the following day. N.T., 2/26/15, at 181.

Appellant felt horrible about the circumstances of Aderotimi's passing; she claimed to be so overwhelmed that she had to move to Delaware to live with her sister. Appellant stayed in Maryland for six to eight weeks and then moved to her parents' home in Philadelphia to await the coroner's report on Aderotimi's death as she believed she could "get house arrest by having a

Philadelphia address." N.T., 2/26/15, at 187. Appellant then moved to Upper Darby, then to New Jersey, then to Plymouth Meeting, Pennsylvania, and then to Chesterbrook, Pennsylvania. Appellant admitted that she used a counterfeit New York driver's license in the name of "Victoria Gordon" to lease the apartment in Chesterbrook. When the landlord's credit check revealed Appellant's name was "Padge," Appellant told him "Padge" had stolen her identity. Appellant took out credit cards in several aliases including Forrest L. Gordon, Forrest Leona G'Ordoni, Forrestleona G'Ordoni, Padgevic Winslowe, and Padge-Victoria Windslowe. Appellant denied that she was trying to conceal her whereabouts.

When Appellant injected Sherkeeia King approximately a year after Aderotimi's death, Appellant did not fear causing her any injury as she used less silicone than she was accustomed to giving customers. Appellant denied responsibility for King's injuries as well, claiming King told her after receiving the injections that she was on Percocet. Appellant also admitted that she continued to sell the hydrogel mixture she made in her kitchen blender to other individuals performing illegal buttocks injections.

In addition, Appellant admitted that she gave silicone buttocks injections to Melissa Lisath in 2008, but denied receiving any communication indicating that Lisath had fell ill subsequent to the injections. She discovered Lisath's illness "in some papers" and at trial. N.T., 2/26/15, at 159. While she recalled that she probably received email messages and phone calls from Matos around the time of Lisath's injury, she did not

answer these messages because she did not want to work with Matos any longer. While Appellant denied reading any bad reviews online from her customers, she bragged that customers on blogs had deemed her the "Michaelangelo of body enhancements." N.T., 2/18/15, at 59.

At the conclusion of the trial, the jury convicted Appellant of third-degree murder, aggravated assault, and possessing of instruments of crime. On June 11, 2015, the trial court sentenced Appellant to an aggregate term of ten to twenty years imprisonment to be followed by six years probation. Appellant filed a motion for a new trial, which the trial court subsequently denied. Appellant filed this timely appeal and complied with the trial court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review:

I. Is [Appellant] entitled to an arrest of judgment on the charge of Murder in the Third Degree where the evidence was insufficient to sustain the verdict as the Commonwealth did not establish malice and hence failed to prove [Appellant] committed Murder?

II. Is [Appellant] entitled to a new trial on the charge of Murder in the First Degree[5] as the weight of the evidence

_____

[5] It appears that Appellant meant to challenge the weight of the evidence supporting her *third*-degree murder conviction. We will overlook this typographical error as Appellant clearly challenges her third-degree murder conviction in the analysis section of her brief. Appellant does not challenge the sufficiency of the evidence supporting her conviction for the aggravated assault of Sherkeeia King.

does not support the verdict and where the verdict was based upon speculation, conjecture, and surmise?

III. Is [Appellant] entitled to a new trial where the Court erred in granting the Commonwealth's 404(b) Motion where the evidence was irrelevant and if determined to be relevant[,] the relevance was outweighed by unfair prejudice?

IV. Is [Appellant] entitled to a new trial where the Court failed to declare a mistrial when [Appellant], had a heart attack, mid-trial and where she was still on cross-examination?

Appellant's Brief, at 3.

First, Appellant challenges the sufficiency of the evidence supporting her third-degree murder conviction. Our standard of review is as follows:

As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

- 16 -

*Commonwealth v. Tukhi*, 149 A.3d 881, 886–87 (Pa.Super. 2016) (citation omitted).

Pursuant to Section 2502 of the Crimes Code, third-degree murder encompasses all forms of murder which do not constitute first-degree murder (intentional killing) or second-degree murder (killing committed during the perpetration of a felony). 18 Pa.C.S. § 2502. In order to sustain a conviction for third-degree murder, the Commonwealth need not establish that the defendant had specific intent to kill or harm the victim, but need only prove that the defendant killed another individual with malice aforethought. *Commonwealth v. Fisher*, 622 Pa. 366, 375, 80 A.3d 1186, 1191 (2013).

> Malice is defined as: wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Malice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury. Malice may be inferred by considering the totality of the circumstances.

*Commonwealth v. Thompson*, 106 A.3d 742, 757 (Pa.Super. 2014) (citation omitted).

Appellant claims her conviction for third-degree murder cannot stand as she asserts that the Commonwealth failed to prove she acted with malice in administering the silicone buttocks injections that led to Aderotimi's death. Appellant boasts of her "marvelous reputation in her community for being able to perform the buttocks enhancements with the greatest of care

- 17 -

and the greatest results" and asserts that in "almost every case, [she did] a fine job." Appellant's Brief, at 19. Appellant argues that she had no way of knowing the risk involved with the procedure she performed. Her counsel concedes that while Appellant's behavior may have been "stupid," it did not rise to gross recklessness. Appellant's Brief, at 19. We disagree.

The Commonwealth presented ample evidence to allow the jury to find that Appellant consciously disregarded an unjustified and extremely high risk that her actions might cause serious bodily injury. Without any legitimate medical training, Appellant performed black market cosmetic procedures by injecting women directly with silicone. Despite the fact that medical professionals do not offer direct silicone injection as an acceptable body shaping procedure, Appellant deemed the injections to be safe after purportedly learning how to inject silicone from a nurse in her apartment and how to mix numbing agents from an alleged doctor in Thailand. Appellant asserted that she did not need formal training or a professional degree to perform body enhancement procedures, implying that transsexual individuals should not be required to follow conventional ways of learning.

Unbeknownst to her clients, Appellant's injections largely consisted of Xiameter 200, an industrial-grade silicone which is used in auto wax and damping fluid as a lubricant; Appellant received large quantities of this product shipped in non-sterile metal tins. Appellant then concocted her own product she deemed "hydrogel" by mixing the Xiameter with saline in her kitchen blender; Appellant repackaged the hydrogel with a bottle crimper to

disguise the substance's true origin from her customers. Appellant chose to ignore the clear warnings provided with the Xiameter that indicated that this product was unsafe for human consumption. When questioned about the warnings, Appellant lied that Neely Industries employees told her it was safe for humans to eat the silicone; Neely Industries customer service representatives adamantly denied this claim.

Appellant then persuaded her clients to rely on her "expertise" by falsely representing herself as a medical professional with the proper education and training to perform a medically-acceptable cosmetic procedure. Not only did Appellant lie about her credentials and the safety of this procedure, but she imitated medical protocol to appear legitimate; she wore gloves and scrubs, cleaned the injection site with alcohol before administering her non-sterile industrial silicone concoction, and instructed the clients with fake post-procedure protocols. Her instructions to drink water and avoid sitting for an extended period of time do not decrease the risk of the foreign substance hitting the client's bloodstream and entering the client's major organs, as silicone cannot be metabolized.

Appellant demonstrated a consciousness of guilt in developing an intricate scheme to obscure her identity. She never gave her clients her real name or any details of her personal life, but identified herself as "Lillian." She avoided giving her actual contact information, would not have direct communication with her clients, used several cell phones with blocked numbers and email addresses such as miamiplasticsurgery@yahoo.com.

After her injection sessions, Appellant carefully packed up all her injections supplies and took them with her. Appellant actively concealed her identity and whereabouts by changing her address six times in the year following Aderotimi's death, using fake names and identification to obtain credit cards and lease her Chesterbrook apartment, and cutting off all communication with clients that could link her to the illegal injections.

Appellant's complete disregard for the harm she caused her clients showed her hardness of heart. Once Aderotimi started to complain of chest pain and shortness of breath immediately after the injections, Appellant feigned medical skill by simulating the actions of a doctor in examining a patient by putting her hand on Aderotimi's chest. Appellant showed no concern for Aderotimi's well-being and felt no duty to call for emergency care or remain with her struggling client; instead, she recommended Aderotimi wait to see if her condition worsened before seeking medical care. This gave Appellant the opportunity to rush to pack up her injection supplies and leave the hotel as quickly as she could. When Appellant was informed of Aderotimi's death, Appellant immediately hung up the phone and closed all lines of communication with the witnesses to Aderotimi's death.

Appellant's recklessness is also demonstrated by her decision to continue to perform silicone injections despite her knowledge that she likely caused Aderotimi's death and Lisath's injuries. When questioned about the circumstances of Aderotimi's death, Appellant lied to her customers and blamed the fatal result on Aderotimi's alleged cocaine overdose on the day

prior to her injection. Appellant disregarded the risk of her procedure and convinced King that it was safe to undergo additional injections, causing King a silicone embolism that damaged her heart, lungs, and buttocks.

While Appellant claims she had no knowledge that her silicone injections could cause death or serious bodily injury, the Commonwealth presented evidence to allow the jury to make an inference to the contrary. In addition to the fact that she recklessly injected clients with industrial grade silicone and ignored the product's clear warnings that it was not to be ingested by humans, Appellant's behavior suggested that she was aware that her silicone injections had caused serious bodily injury to Melissa Lisath years earlier in 2008. Before Lisath's injury, Appellant typically had regular communication with Stephanie Matos, the woman who referred Lisath for injections; as soon as Lisath was hospitalized and entered a coma, Appellant suddenly ceased all communication with Matos and took her business, "Body by Lillian" off the blogs where Matos has discovered her. Matos testified that it was if Appellant had "disappeared." N.T., 2/18/15, at 25.

We are not persuaded by Appellant's reliance on the decision in **Commonwealth v. Ludwig**, 583 Pa. 6, 874 A.2d 623 (2005) in which our Supreme Court affirmed the trial court's grant of the defendant's *habeas corpus* petition as it found the Commonwealth failed to establish a *prima facia* case of malice to support a conviction under 18 Pa.C.S. § 2506 ("Drug delivery resulting in death"). In **Ludwig**, the nineteen-year-old defendant sold Ecstasy pills to two juvenile girls and their eighteen-year-old friend at

the girls' request.  The Supreme Court reasoned that the prosecution failed to show that the defendant's action in selling illegal drugs on its own did not demonstrate the requisite "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty such as to demonstrate an extreme indifference to human life" needed to prove the mental state of malice.  *Ludwig*, 583 Pa. at 25, 874 A.2d at 634.

This case can be easily distinguished from *Ludwig*.  Appellant deceived her customers into believing she was a medical professional trained to perform an acceptable and safe buttocks enhancement procedure at a discounted price.  She misled women by claiming her homemade concoction of non-sterile industrial silicone was a medical-grade substance suitable for human injection and blatantly ignored written warnings that silicone should not be ingested by humans.  Appellant's cruelty is demonstrated in her abandonment of Aderotimi as she experienced severe chest pain and trouble breathing after receiving injections; Appellant recklessly told Aderotimi to wait to seek medical care while she fled the hotel.  In continuing to brag that she was able to produce great results, Appellant disregards her causation of severe injury to King and Lisath and the death of Aderotimi; she minimalizes the fact that she injected numerous women with large amounts of silicone, a harmful substance which cannot be removed from the body. Appellant demonstrated an extreme indifference to human life by continuing to induce women to obtain silicone injections despite her knowledge that she likely caused Lisath's injuries and Aderotimi's death.

Viewing the totality of the circumstances, we find the Commonwealth presented ample evidence that Appellant acted with malice as she demonstrated a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences and a mind regardless of social duty such as to demonstrate an extreme indifference to human life." ***Ludwig***, ***supra***. On repeated occasions, Appellant consciously disregarded an unjustified and extremely high risk that her actions might cause serious bodily injury. Accordingly, we conclude that the jury's decision to convict Appellant of third-degree murder is supported by sufficient evidence.

Second, Appellant challenges the weight of the evidence supporting her third-degree murder conviction. When reviewing a challenge to the weight of the evidence, our standard of review is as follows:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the

underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Mucci*, 43 A.3d 399, 410–11 (Pa.Super. 2016), (quoting *Commonwealth v. Clay,* 619 Pa. 423, 64 A.3d 1049, 1054–55 (2013)).  To successfully challenge the weight of the evidence, a defendant must prove the evidence is "so tenuous, vague and uncertain that the verdict shocks the conscience of the court."  *Mucci*, 43 A.3d at 411 (quoting *Commonwealth v. Sullivan,* 820 A.2d 795, 806 (Pa.Super. 2003)).

Appellant repeats arguments she set forth in her challenge to the sufficiency claim, claiming the Commonwealth did not prove Appellant knew that her injections could cause serious bodily injury or death.  We need not reiterate our discussion of the sufficiency of the evidence as set forth above.  To the extent that Appellant argues that she "believed in her heart that she was trying to help young women look better," she is merely asking us to credit her account of the facts and reweigh the evidence in her favor.  We will not substitute our judgment for that of the factfinder, as the jury "is free to believe all, none or some of the evidence and to determine the credibility of the witnesses."  *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa.Super. 2015).  We conclude that the trial court properly exercised its discretion in denying Appellant's motion for a new trial based on the weight of the evidence.

Third, Appellant claims the trial court erred in allowing the admission of prior bad act evidence showing Appellant's injections had also caused

Melissa Lisath to become seriously ill. In reviewing a trial court's discretion in evidentiary issues, our standard of review is as follows:

> [q]uestions regarding the admission of evidence are left to the sound discretion of the trial court, and we, as an appellate court, will not disturb the trial court's rulings regarding the admissibility of evidence absent an abuse of that discretion. An abuse of discretion is not merely an error of judgment; rather, discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record....

*Commonwealth v. Richard*, 150 A.3d 504, 512 (Pa.Super. 2016) (citation omitted).

Our Supreme Court has set forth the circumstances in which a defendant's prior bad acts are admissible at trial:

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact. *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 419 (2008).

*Commonwealth v. Sherwood*, 603 Pa. 92, 982 A.2d 483, 497 (2009).

Appellant claims the trial court's admission of this evidence was "manifestly unreasonable primarily because there simply was a lack of connection between Miss Lisath's injuries and the mental state of [Appellant]" at the time of Aderotimi's death. Appellant's Brief, at 27. We

- 25 -

agree with the trial court's finding that evidence that Lisath was hospitalized with serious injuries after receiving Appellant's injections in 2008 was relevant to refute Appellant's claim that she had no knowledge that her silicone injections could cause serious bodily harm before she administered the injections that caused Aderotimi's death in 2011.

While the admission of evidence of Appellant's prior injury to Lisath was prejudicial to the defense, we must ask whether the admission of these circumstances was *unfairly* prejudicial. **See** Pa.R.E. 404(b)(2) (stating that prior bad act evidence is "admissible only if the probative value of the evidence outweighs its potential for unfair prejudice"); **Commonwealth v. Dillon**, 592 Pa. 351, 367, 925 A.2d 131, 141 (2007) (stating that "[e]vidence will not be prohibited merely because it is harmful to the defendant").

The probative value of the admission of evidence of Appellant's prior injury to Lisath outweighed the potential for unfair prejudice. This evidence had great probative value to assist the Commonwealth in establishing Appellant's state of mind, or more specifically, that Appellant caused Aderotimi's death with malice aforethought. Moreover, the trial court's cautionary instruction ameliorated any prejudicial effect of the evidence. The trial court advised the jury of the limited purpose for which the evidence was introduced and prohibited them from using this evidence to conclude Appellant acted in conformity with these acts or to show criminal propensity. We presume that a jury follows a trial court's instructions. **Commonwealth**

***v. Hairston***, 624 Pa. 143, 160, 84 A.3d 657, 666 (2014) (finding the trial court's cautionary instruction minimized the likelihood that the prior bad act evidence would inflame the jury or cause it to convict the defendant on an improper basis). Thus, we conclude that the trial court did not abuse its discretion in admitting this evidence.

Lastly, Appellant argues that the trial court erred in failing to grant a mistrial alleging that the trial court improperly allowed Appellant to continue to testify after she had been hospitalized for a "heart attack or a heart related incident several days earlier." Appellant's Brief, at 27. Our review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. ***Commonwealth v. Faurelus***, 147 A.3d 905, 914 (Pa.Super. 2016).

Appellant's trial began on February 19, 2015, after which Appellant testified on her own behalf on February 26-27, 2015. Before the prosecution had finished its cross-examination of Appellant, the trial court was informed on March 2, 2015, that Appellant had been hospitalized for complaints of chest pains. Shortly thereafter, Appellant's treating physician informed the trial court that Appellant had undergone a minor procedure, would be treated with medication, and would be able to proceed with her testimony at trial upon being discharged from the hospital.

On March 6, 2015, the parties reconvened before the trial court. Counsel expressed some concern for Appellant's health and her ability to withstand cross-examination, but also emphasized his concern that he would

be liable for any harm Appellant sustained from the stress of testifying. The prosecutor shared that he was nearly finished with cross-examining Appellant and confirmed that he would need only fifteen more minutes of testimony. After a short colloquy by the trial court, Appellant admitted that she was feeling well enough to continue cross-examination. The trial court assured Appellant that she could ask for a break if she was not feeling well. The prosecutor then continued with a brief period of cross-examination during which Appellant did not complain of any difficulty.

Based on these facts, we agree with the trial court's conclusion that a mistrial was not warranted. Appellant's counsel offered no medical evidence that would suggest that Appellant could not proceed with her testimony; in fact, Appellant's treating physician reported that Appellant suffered no damage and could return to the witness stand upon her discharge from the hospital. Appellant agreed to continue with cross-examination as she told the trial court that she "felt better." N.T. 3/6/15, at 23. Appellant then finished a brief portion of cross-examination, never reporting any problem or asking for a break. Moreover, Appellant does not attempt to argue that her choice to continue with her testimony resulted in any prejudice. Accordingly, we conclude that the trial court properly exercised its discretion in denying Appellant's motion for a mistrial.

For the foregoing reasons, we affirm Appellant's judgment of sentence.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/28/2017