J-A22016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA

v.

JARROD MICHAEL CLAPPER

Appellant

:
:
:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1163 WDA 2023

Appeal from the Judgment of Sentence Entered August 4, 2023
In the Court of Common Pleas of Bedford County Criminal Division at
No(s):  CP-05-CR-0000241-2022

BEFORE:  MURRAY, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED: January 21, 2025**

Jarrod Michael Clapper appeals from the judgment of sentence entered following his convictions for institutional sexual assault, corruption of a minor, and unlawful contact with a minor.[1] He challenges the sufficiency and weight of the evidence, the court's allowance of an exhibit during jury deliberations, and his sexual offender registration as required by the Sexual Offender Registration and Notification Act ("SORNA").[2] We affirm.

The Commonwealth charged Clapper, who worked for the Bedford Area School District, with the above offenses following sexual contact with a student, R.M. At trial, the Commonwealth presented the testimony of three

---

[1] 18 Pa.C.S.A. §§ 3124.2(a.2), 6301(a)(1)(i), and 6318(a)(1), respectively.

[2] ***See*** 42 Pa.C.S.A. §§ 9799.10-9799.42.

witnesses: John Diehl, the Director of Technology for the Bedford Area School District; R.M.; and R.M.'s friend, T.C. The witnesses testified as follows.

Diehl testified that he hired Clapper in July 2021 as a computer technician for the Bedford Area School District. N.T. Trial, 4/20/23, at 43. Clapper was 24 years old at that time. *Id.* at 52. Diehl stated that Clapper's job duties included "support[ing] students and teachers with technology support[.]" *Id.* at 44-45. Diehl testified that Clapper worked in both the middle school and high school. *Id.* at 47. Clapper would be at the middle school in the mornings, and then would go to the high school in the afternoons. *Id.* Diehl said that Clapper would "work with kids and teachers to make sure their technologies were . . . efficient." *Id.* at 45. Diehl stated that each student had an iPad and "if a teacher is having any issues or a student is having issues with their devices the technician would be [the] first line of support so they go into the classroom, help kids or teachers with making sure their devices are efficient, work functioning." *Id.* at 48.

Diehl further testified that Clapper provided support to students in an elective class called "student technology assistance program." *Id.* at 48-49. There, high school students would gain real-world technology experience, such as learning to do a help desk or design a website. *Id.* Diehl explained that students who were interested in technology would "work hand in hand with members of the technology department to gain that real work [] experience[.]" *Id.* at 49. Diehl testified that all members of the school's tech department, including Clapper, would be supporting the students as they were

learning technology in this class, which involved providing guidance and support to those students. *Id.* at 49-50.

R.M. testified that in December of 2021, she was 17 years old and a junior at Bedford Area High School. *Id.* at 54. She stated that she met Clapper in August or September 2021 at Bedford Area High School. *Id.* at 55. She knew Clapper as the "IT tech person of our school." *Id.* at 56. She was also familiar with Clapper since he was friends with her older sisters. *Id.* at 55. R.M. stated that students at her school ran an Instagram page where they posted funny pictures of people's shoes. *Id.* at 56. She said that one day, she took a picture of Clapper's cowboy boots while they were at a sports practice and posted it on the Instagram page. *Id.* She testified that after she posted the picture, Clapper contacted her through direct message on Instagram. *Id.* The two then started communicating through Snapchat. *Id.* at 57. R.M. said she sometimes saw Clapper at school in an office belonging to a teacher, Ms. Baker. *Id.* She explained that she was an online student and Ms. Baker oversaw the online school. *Id.* at 58. R.M. said that she and Clapper would not talk at school except for comments such as, "[H]ey or how's your day going at school[.]" *Id.* at 57. The Commonwealth introduced into evidence a spreadsheet showing R.M.'s and Clapper's Snapchat conversations. *Id.* at 59-61. Some of the messages were sexual in nature. *Id.* at 66, 69, 72.

R.M. testified that on December 23, 2021, her friend, T.C. was at her house. *Id.* at 73. That evening, T.C. wanted to go hang out with a boy, L.S., so R.M. tried to find someone to hang out with. *Id.* at 74. R.M. contacted

Clapper through Snapchat and he agreed to meet with her. *Id.* R.M. testified that she took a marijuana gummy because she was anxious as "it was [her] first time hanging with [Clapper] without anyone else around[.]" *Id.* at 75. She stated that she made arrangements with Clapper to meet at a trail near the Bedford Springs Resort. *Id.* at 76. L.S. picked up T.C. and R.M. and drove to the trail. *Id.* R.M. stated that she sat in L.S.'s vehicle until she saw Clapper pull up in a white Cadillac. *Id.* at 77. She then got out of L.S.'s vehicle and got into the passenger side of Clapper's vehicle. *Id.* R.M. said that L.S. and T.C. left and Clapper then drove R.M. to the Bedford County Airport because Clapper wanted to show R.M. his airplane. *Id.* at 75, 77-78.

R.M. testified that once they got through the airport's gate and parked, Clapper put his hand on her inner thigh and leaned over and kissed her. *Id.* at 79. He then put his hands in her pants and told her to get into the back seat. *Id.* She said that they then both got into the backseat. *Id.* R.M. testified that Clapper then took her pants off, kissed her, pulled her on top of him, and had sexual intercourse with her. *Id.* at 79-80. R.M. testified that while they were having sexual intercourse, T.C. called her and told her she was done hanging out with L.S. *Id.* at 80. Clapper then drove R.M. back to her house. *Id.* R.M. could not recall if she told T.C. what happened when they were both back at the house. *Id.* at 81. The next day, R.M. told her best friend, C.B., what happened. *Id.* R.M. testified that she did not report the incident to the police or to school officials because she "gave [her] consent and [she] did not want [Clapper] to get in trouble." *Id.* However, rumors about the incident

spread around the school and the principal approached her about it. *Id.* at 82, 104-06. R.M. eventually talked to the Pennsylvania State Police and told them what happened. *Id.* at 82.

On cross-examination, R.M. testified that Clapper never sent her any inappropriate pictures or asked her for sex. *Id.* at 90, 93. She agreed with defense counsel that she was trying to have sex with Clapper. *Id.* at 89. R.M. also confirmed that there was context missing from the Snapchat messages that the Commonwealth introduced. *Id.* at 91-93. She stated that the marijuana gummy she took on the night of the incident may have affected her recollection of what she told T.C. that night, but she had a clear recollection of what happened with Clapper. *Id.* at 111, 113.

R.M.'s friend, T.C., testified that on December 23, 2021, she was staying overnight at R.M.'s house. *Id.* at 117-118. T.C. said that she made plans to see L.S., and R.M. made plans to hang out "with a guy named Jarrod." *Id.* at 118-19. T.C. said that R.M. told her that she and Clapper were messaging each other on Instagram, and had "been snapping back and forth" on Snapchat. *Id.* at 119-20. T.C. recalled that L.S. picked her and R.M. up at R.M.'s house, and then dropped R.M. off near the Bedford Springs Resort. *Id.* T.C. saw a vehicle there when they dropped R.M. off, but she did not see the person in the vehicle. *Id.* at 120, 124. T.C. testified that later that night, L.S. dropped her off at R.M.'s house. *Id.* at 121. She said R.M. was already home and "seemed completely normal" and not under the influence of any drugs. *Id.* at 121, 125-26.

Clapper presented four character witnesses, including family friends and his pastor. *Id.* at 136-155. The defense then rested. The parties proceeded to closing argument and the court gave the jury instructions. Shortly before the jury began to deliberate, the court asked counsel what their position was on whether the spreadsheet of R.M.'s and Clapper's Snapchat messages should go back with the jury during deliberations. *Id.* at 202. Defense counsel objected to the exhibit going back, stating that only a portion of the spreadsheet was read into the record and "[t]here's a lot of testimony about context and what's missing and what's not and we don't know." *Id.* at 203. The court overruled the objection, noting that the exhibit was admitted and "there was cross examin[ation] on what may be missing from it[.]" *Id.*

Following deliberations, the jury found Clapper guilty of the above offenses. The court sentenced him to an aggregate term of seven to 23 months' imprisonment plus three years' probation. The court also ordered Clapper to register as a Tier II sex offender pursuant to SORNA. Clapper filed a post-sentence motion arguing the verdict was against the weight of the evidence. The trial court denied the motion, and this appeal followed.

Clapper raises the following issues:

I. Did the trial court err in finding sufficient evidence to convict [Clapper] of all charges where:

    a. For the institutional sexual assault charge, the Commonwealth failed to prove that [Clapper], as an IT technician, was an "employee" who had "direct contact" with students at the Bedford Area School District as defined by the statute or that [Clapper] worked at the same school that the complainant attended given that

the complainant attended an online program which was different from the regular middle school or high school for which [Clapper] worked?

b. For the corruption of minors charge, the Commonwealth failed to prove that there is anything inherently illegal or immoral about a 24-year-old having consensual sex with a 17-year-old given that 16 is the age of consent in Pennsylvania and [Clapper] did not have any involvement in the complainant's education in his role as an IT technician?

c. For the unlawful contact – sexual offenses charge, the only charged sexual offense was institutional sexual assault, the evidence was insufficient to support a conviction for that offense, and the Commonwealth did not prove that [Clapper] had contact with the complainant for the purpose of engaging in any prohibited sex act?

II. Whether the trial court erred denying the post-sentence motion for a new trial because the verdict was against the weight of the evidence?

III. In the alternative, whether the trial court violated Pa.R.Crim.P. 646 by allowing the jury to review a Snapchat communication chart of messages exchanged between [Clapper] and the complainant during jury deliberations because the chart arguably served as a written confession from [Clapper]?

IV. Whether the trial court erred in requiring [Clapper] to register pursuant to SORNA without holding an individualized evidentiary hearing because SORNA's mandatory, irrebuttable presumptions violate [Clapper's] right to reputation under the Pennsylvania Constitution?

Clapper's Br. at 10-11 (suggested answers omitted).

## I. Sufficiency of the Evidence

Clapper's first issue challenges the sufficiency of the evidence, which is a question of law. "Our standard of review is *de novo*, and our scope of review is plenary." ***Commonwealth v. Mikitiuk***, 213 A.3d 290, 300 (Pa.Super.

2019). When reviewing a challenge to the sufficiency of the evidence, we "must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt." ***Commonwealth v. Feliciano***, 67 A.3d 19, 23 (Pa.Super. 2013) (*en banc*) (citation omitted). "Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail." ***Id.*** (citation omitted). This standard applies equally where the Commonwealth's evidence is circumstantial. ***Commonwealth v. Patterson***, 180 A.3d 1217, 1229 (Pa.Super. 2018). The factfinder, "while passing on the credibility of the witnesses and the weight of the evidence — is free to believe all, part, or none of the evidence." ***Commonwealth v. Miller***, 172 A.3d 632, 640 (Pa.Super. 2017). This Court "may not substitute our judgment for that of the factfinder." ***Commonwealth v. Griffith***, 305 A.3d 573, 576 (Pa.Super. 2023), *appeal denied*, 319 A.3d 503 (Pa. 2024).

Clapper first argues that the evidence was insufficient to convict him for institutional sexual assault. He contends that the Commonwealth failed to prove that he was an "employee" of the school, as defined under the institutional sexual assault statute. Clapper's Br. at 26. He maintains that the statute, by its terms, does not apply to all employees of a school. Rather, it only applies to the designated employees listed in the statute "such as principals, teachers, and others who are specifically mentioned in the statute"

and those designated employees are "almost all employees who work directly with students and who have some sort of supervisory or educational role." *Id.* Clapper points out that the list of employees in the statute "plainly does not include computer technicians or IT workers." *Id.*

Clapper acknowledges that the statute also applies to "any other employee who has direct contact with school students." *Id.* (quoting 18 Pa.C.S.A. §§ 3124.2(a.2)(2)(ii)(A)(I)) (emphasis removed). Clapper, however, argues the Commonwealth failed to prove he had "direct contact" with the students at the Bedford Area School District because it did not prove he "provided care, supervision, guidance, or control to the school students," as required by the statute. *Id.* at 26-27. He argues the evidence only established that his job was to fix devices that had problems and provide tech support. *Id.* at 28. Clapper notes that Diehl testified that Clapper worked as a computer technician at the school, but he did not testify that Clapper had direct contact with students as defined by the statute. *Id.* at 27. According to Clapper, "[c]are, supervision, guidance, and control all involve an essentially teacher-like roles of educating the students" and "does not automatically involve working on the school computers or fixing a student's electronic device should the device malfunction." *Id.* at 27-28.

Clapper further argues that the Commonwealth failed to prove that he worked at the same school that R.M. attended "given that [R.M.] attended an online program which was different from the regular middle school or high school for which he worked." *Id.* at 24-25, 28-29. Clapper lastly points out

that he and R.M. "already knew of each other before she ever met him at school" as "they were close in age, and [he] was friends with her two older sisters." *Id.* at 29.

The crime of institutional sexual assault occurs when "a person who is a volunteer or an employee of a school or any other person who has direct contact with a student at a school . . . engages in sexual intercourse, deviate sexual intercourse or indecent contact with a student of the school." 18 Pa.C.S.A. § 3124.2(a.2)(1).

An "employee" is statutorily defined as including enumerated jobs, as well as "any other employee who has direct contact with school students." 18 Pa.C.S.A. § 3124.2(a.2)(2)(ii)(A)(I). An "employee" also statutorily includes "[a]n independent contractor who has a contract with a school for the purpose of performing a service for the school[.]" 18 Pa.C.S.A. § 3124.2(a.2)(2)(ii)(A)(II). The statute provides that an "employee" includes the following:

> (I) A teacher, a supervisor, a supervising principal, a principal, an assistant principal, a vice principal, a director of vocational education, a dental hygienist, a visiting teacher, a home and school visitor, a school counselor, a child nutrition program specialist, a school librarian, a school secretary the selection of whom is on the basis of merit as determined by eligibility lists, a school nurse, a substitute teacher, a janitor, a cafeteria worker, a bus driver, a teacher aide and **any other employee who has direct contact with school students.**

> (II) An independent contractor who has a contract with a school for the purpose of performing a service for the school, a coach, an athletic trainer, a coach hired as an independent contractor by the Pennsylvania Interscholastic Athletic

Association or an athletic trainer hired as an independent contractor by the Pennsylvania Interscholastic Athletic Association.

18 Pa.C.S.A. § 3124.2(a.2)(2)(ii)(A) (emphasis added). The statute explicitly excludes from the definition of "employee" "[a]n independent contractor or any employee of an independent contractor who has no direct contact with school students." 18 Pa.C.S.A. § 3124.2(a.2)(2)(ii)(B)(II). "Direct contact" means "[c]are, supervision, guidance or control." 18 Pa.C.S.A. § 3124.2(a.2)(2)(i).

Clapper's argument that the Commonwealth failed to prove that he had direct contact with students at the school, as defined by the statute, is without merit. Diehl testified that Clapper worked at the middle school and high school and would "work with [the] kids" to make sure their technologies were efficient. N.T. at 45. This included Clapper going into classrooms to assist the students. *Id.* at 48. Diehl also testified that Clapper participated in the "student technology assistance program" where he would "work hand in hand" with students so that they could gain real work technology experience. *Id.* at 48-49. When asked whether Clapper provided guidance and supervision to those students, Diehl responded, "Absolutely." *Id.* at 49-50.

Clapper's claim that the Commonwealth failed to prove that he worked at the same school that R.M. attended because R.M. attended online school is likewise without merit. The evidence showed that although R.M. attended online classes, she was still considered a student at Bedford Area High School and was physically present at times at the school. R.M. testified that in

- 11 -

December of 2021, she was in 11ᵗʰ grade and went to "Bedford Area High School." *Id.* at 54. She further testified that she took a picture of Clapper's shoes at a Bedford Area High School sports practice and posted it on the school's shoes Instagram account. *Id.* at 56. R.M. also testified that she would sometimes see Clapper at school when she was in Ms. Baker's office and would exchange comments with him such as, "[H]ey or how's your day going at school[.]" *Id.* at 57-58.

This evidence was sufficient to show that Clapper was an "employee" of the school and had "direct contact" with students by providing "[c]are, supervision, guidance or control," as defined under the institutional sexual assault statute. 18 Pa.C.S.A. §§ 3124.2(a.2). Thus, the evidence was sufficient to support Clapper's conviction for institutional sexual assault.

Clapper next argues the evidence was insufficient to convict him of corruption of a minor. He maintains that he did not corrupt the morals of R.M. because she was 17 years old at the relevant time, and the age of consent in Pennsylvania is 16 years old. Clapper's Br. at 31, 33. Clapper emphasizes that the law does not prohibit consensual sex between a 17-year-old and a 24-year-old. He points out that R.M. "repeatedly sought sexual intercourse from him by texting him in an extremely direct manner." *Id.* at 31. According to Clapper, "there is nothing inherently corrupting about having consensual, otherwise legal sexual intercourse with a computer technician at the area high school." *Id.* He concludes that he and R.M. "were close in age, they did not

interact at school, he did not have any supervisory role over her, and he worked not as a teacher but as a computer technician." *Id.* at 32.

A person commits the crime of corruption of minors where, in relevant part, he is over 18 years old and "by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age[.]" 18 Pa.C.S.A. § 6301(a)(1)(i). "Actions that tend to corrupt the morals of a minor are those that would offend the common sense of the community and the sense of decency, propriety and morality which most people entertain." *Commonwealth v. Sebolka*, 205 A.3d 329, 339 (Pa.Super. 2019) (citation omitted). Further,

> [c]orruption of a minor can involve conduct towards a child in an unlimited number of ways. The purpose of such statutes is basically protective in nature. These statutes are designed to cover a broad range of conduct in order to safeguard the welfare and security of our children. Because of the diverse types of conduct that must be proscribed, such statutes must be drawn broadly. It would be impossible to enumerate every particular act against which our children need be protected.

*Commonwealth v. Decker*, 698 A.2d 99, 101 (Pa.Super. 1997) (citation omitted).

Here, there is no dispute that Clapper was over 18 years old and R.M. was a minor at the relevant time. R.M. testified that Clapper engaged in sexual contact with her while she was a student at the school where he worked. Such testimony was sufficient to support Clapper's conviction for corruption of a minor. Contrary to Clapper's suggestion, the statute does not provide any exception if the sexual contact was consensual. No relief is due on this claim.

Clapper next argues that the evidence was insufficient to support his conviction for unlawful contact with a minor. Clapper's Br. at 33. He asserts that the statute for unlawful contact with a minor requires an underlying offense and the only alleged sexual offense in this case was institutional sexual assault. Clapper claims that since the evidence was insufficient to support the underlying offense of institutional sexual assault, his conviction for unlawful contact with a minor cannot stand. *Id.*

Relevant here, a person commits the offense of unlawful contact with a minor "if the person is intentionally in contact with a minor . . . for the purpose of engaging in an activity prohibited under . . . [a]ny of the offenses enumerated in Chapter 31 (relating to sexual offenses)." 18 Pa.C.S.A. § 6318(a)(1).

Here, the Chapter 31 offense was institutional sexual assault. *See* N.T. at 195 (trial court charging jury that institutional sexual assault was the predicate offense to the unlawful contact with a minor charge). Since we have found that the evidence was sufficient to support Clapper's conviction for institutional sexual assault, his claim that the evidence was insufficient to support his conviction for unlawful contact with a minor necessarily fails.

## II. Weight of the Evidence

Clapper next argues that the verdict was against the weight of the evidence. He maintains that the Commonwealth's evidence at trial was so unreliable that the verdict shocks the conscience. Clapper's Br. at 36. He points out that R.M. "testified that she was under the influence of a marijuana

edible which affected her memory enough that she could not remember if she told [T.C.] about the alleged incident." *Id.* Clapper argues that the text messages between himself and R.M. "did not reflect Clapper ever agreeing to meet up with her for sex or any discussion of it afterwards." *Id.* He emphasizes that there were no other witnesses or any physical evidence, and he did not make any incriminating statements. *Id.* According to Clapper, "[n]one of the conversations between [R.M.] and [Clapper] corroborated her allegations, and the evidence instead suggested that [R.M.] had told her friends a story to impress them and then she was stuck repeating that story once the authorities heard the rumors and became involved." *Id.* at 37. He concludes that his "good character alone was enough evidence to constitute reasonable doubt[.]" *Id.*

"We review a trial court's order denying a weight challenge for an abuse of discretion." ***Commonwealth v. Fallon***, 275 A.3d 1099, 1107 (Pa.Super. 2022). Because the trial court heard the testimony firsthand, we must "give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." *Id.* (citation omitted). A weight claim requires the defendant to first convince the trial court that "the evidence is so tenuous, vague and uncertain that the verdict shocks the conscience of the court." ***Commonwealth v. Windslowe***, 158 A.3d 698, 712 (Pa.Super. 2017) (internal quotation marks and citation omitted). This Court then reviews the trial court's decision in this regard for an abuse of discretion. *Id.* Further,

"[t]he weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." ***Commonwealth v. Champney***, 832 A.2d 403, 408 (Pa. 2003) (citation omitted). "When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited." ***Commonwealth v. Bowen***, 55 A.3d 1254, 1262 (Pa.Super. 2012) (citation omitted).

Here, the trial court found that R.M testified credibly. Trial Court Opinion, filed 11/16/23, at 3. It noted that her demeanor on the witness stand was credible, and her testimony contained numerous details. ***Id.***

We cannot say that the trial court abused its discretion in finding the verdict did not shock the conscience. The jury was free to believe all, part, or none of the evidence presented in judging the credibility of the witnesses and evidently credited R.M.'s testimony. ***Champney***, 832 A.2d at 408. No relief is due.

### III. Allowance of Exhibit During Jury Deliberations

Clapper argues that the court erred in permitting the spreadsheet of his and R.M's Snapchat messages to be sent to the jury during deliberations. Clapper's Br. at 37. He asserts that his messages were tantamount to a confession because they showed he did not respond appropriately to R.M.'s sexually explicit messages. ***Id.*** at 38. In his view, the court violated Pennsylvania Rule of Criminal Procedure 646 when it gave the exhibit to the jury, as Rule 646 prohibits giving the jury during deliberations "a copy of any

written or otherwise recorded confession by the defendant." *Id.* at 37-38 (quoting Pa.R.Crim.P. 646(C)(2)). Clapper argues that he was prejudiced because by "allowing the jury to focus improperly on the purported Snapchat messages during deliberations caused the jury to lose sight of the rest of the evidence or lack thereof" and his "failure to respond by telling [R.M.] to stop or ceasing all communications would have been viewed by the jury as incriminating and as a confession." *Id.* at 41.

Clapper has waived this issue. At trial, Clapper did not object to the exhibit going back to the jury during deliberations on the basis that the messages were a confession. Rather, he only objected based on lack of context. *See* N.T. at 202-03. This claim is therefore waived. *See* Pa.R.A.P. 302(a) ("[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal").

Even if not waived, the issue lacks merit. Rule 646 prohibits confessions from being sent out with the jury during deliberations. *See* Pa.R.Crim.P. 646(C)(2). The exhibit here was not a confession. None of Clapper's messages admitted that he had sex with R.M. or that he committed a crime. Further, the jury heard testimony at trial that portions of the messages were missing or were out of context. Since the exhibit was not a confession, the trial court did not violate Rule 646 by allowing the jury to have the exhibit during deliberations.

**IV. SORNA**

Clapper's final issue is that the court erred in failing to hold an evidentiary hearing when it imposed SORNA registration requirements. Clapper's Br. at 41. He argues that SORNA's irrebuttable presumptions violate his right to reputation and due process under the Pennsylvania Constitution. *Id.* at 41, 43. He asserts that other cases raising this argument have been remanded to the trial court for an evidentiary hearing to make a factual record. *Id.* at 42.

This claim is without merit due to our Supreme Court's recent decision in *Commonwealth v. Torsilieri*, 316 A.3d 77 (Pa. 2024) ("*Torsilieri II*"). While the instant appeal was pending, our Supreme Court held that the presumption that adult sexual offenders posed a high risk of reoffending did not violate due process, and that SORNA's Revised Subchapter H registration requirements were not punitive in nature and did not constitute cruel and unusual punishment. *See id.* at 99-100, 109-110.[3] Because Clapper's claims are the same as those raised in *Torsilieri II*, we conclude that Clapper is likewise not entitled to relief.[4]

Judgment of sentence affirmed.

---

[3] *Torsilieri II* was decided on May 31, 2024.

[4] Clapper acknowledges that his constitutional claims are the same that were raised in *Commonwealth v. Torsilieri*, 232 A.3d 567 (Pa. 2020) ("*Torsilieri I*") and that the case was pending in the Pennsylvania Supreme Court at the time of the filing of his brief. Clapper's Br. at 43.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 01/21/2025