J-S03011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHN PETTIT, | |
| Appellant | No. 3041 EDA 2016 |

Appeal from the Judgment of Sentence Entered August 25, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001746-2010

BEFORE: BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JUNE 05, 2018**

Appellant, John Pettit, appeals from the judgment of sentence imposed after a jury convicted him of third-degree murder and related offenses. We affirm.

The trial court summarized the procedural history and factual background of this case as follows:

> On June 30, 2016, after a jury trial, [Appellant] was convicted of murder of the third degree, conspiracy to commit murder of the third degree, and recklessly endangering another person.[1] On August 25, 2016, this court sentenced [Appellant] to a term of seven and one-half (7½) to fifteen (15) years of imprisonment on the murder-of-the-third-degree charge. On the bill charging conspiracy to commit third-degree murder, [Appellant] was placed on a period of ten (10) years of probation, to be served consecutively. On the bill charging recklessly endangering another person, [Appellant] received a concurrent sentence of one

_____

[*] Former Justice specially assigned to the Superior Court.

(1) to two (2) years of incarceration. No further penalty was imposed on the charge of conspiracy to conceal or tamper with evidence. On the bill charging false reports to police, [Appellant] was sentenced to a concurrent sentence of one (1) to two (2) years.

> [1] On October 26, 2012, following a jury trial before the Honorable Jeffrey Minehart, [Appellant] was found guilty of Hindering Prosecution; False Reports; and Conspiracy to Tamper with Evidence. The jury found [Appellant] not guilty of Aggravated Assault. The jury was unable to reach a verdict on: Count 1, Murder of the Third Degree; Count 2 - Conspiracy; and Count 7 - Recklessly Endangering Another Person. Also on October 26, 2012, Judge Minehart declared a mistrial as to Counts 1, 2, and 7. [Appellant] accepted a non-negotiated guilty plea to Counts 1 and 7 on July 14, 2014[.] On November 30, 2015, upon review of the record, applicable law and arguments of counsel, this court allowed [Appellant] to withdraw his guilty plea and proceed to trial.

At trial, [Appellant] was represented by A. Charles Peruto Jr., Esquire and David Bahuriak, Esquire. [Appellant] subsequently retained Jack McMahon, Esquire, for appellate representation.

On or about September 13, 2016, [Appellant] filed a Notice of Appeal.[2] On November 23, 2016, upon receipt of all of the trial transcripts, this court ordered counsel for [Appellant] to file a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. … 1925(b). On December 12, 2016, counsel filed a motion for extension of time, which motion this court granted. On January 11, 2017, counsel filed a Statement of Matters Complained of on Appeal.

> [2] On January 9, 2017, [Appellant's] Motion for Reconsideration of Sentence was denied by operation of law, pursuant to Pennsylvania Rule of Criminal Procedure, Rule 720(B)(3)(c).[1]

In his [Rule] 1925(b) Statement, [Appellant] claims that the evidence was "insufficient as a matter of law to prove beyond a reasonable doubt that [he] was [not] justified in his actions." [Appellant] also argues that the verdict was against the weight of

---

[1] As we discuss further *infra,* Appellant had untimely filed this post-sentence motion on September 7, 2016.

the evidence. Additionally, [Appellant] alleges that this court's "charge on conspiracy was inconsistent with bills of information and the conduct originally charged."

## THE EVIDENCE

The evidence adduced at trial established beyond reasonable doubt that on October 16, 2009, [Appellant] used unlawful force against Mr. James Koons [(decedent)] in the parking lot of the Oasis Gentleman's Club located at 1600 Essington Avenue in Southwest Philadelphia, which conduct was the direct cause of death of the decedent.[3] The jury also found the evidence to be sufficient to support the guilty verdicts on the charges of conspiracy to commit third-degree murder and recklessly endangering another person (Mr. George Foreacre).

> [3] The decedent survived and lived on life support for approximately two weeks without regaining consciousness. On November 2, 2009, after the decedent's family made the decision to end life support, the decedent passed away.

### *The Murder and Investigation*

Detective Brian Peters testified that he was assigned to the investigation with regard to the decedent's death on November 2, 2009. Detective Peters indicated that as part of the investigation, he reviewed the surveillance video pertaining to the incident. For the benefit of the jury, Detective Peters reviewed the video compilation prepared by Detective James Dunlap.

Diana Zaccagnini testified that she knew [Appellant] through her work at the Oasis Gentleman's Club where she bartended approximately three nights a week.

Asked to provide an account of the events on October 16, 2009, Ms. Zaccagnini stated:

> I was bartending. There were two men - more than two men in the club. Two men, in particular … were being loud and obnoxious and rude. I thought something was going to happen…. Everything happened really fast. They were asked to leave. I guess they were being escorted out. That is why I am here.

Ms. Zaccagnini remembered that the two men started a tab and that she kept the credit card behind the bar. She confirmed that

- 3 -

she gave a statement the night of the incident and attested to her statement's accuracy.[4]

> [4] Ms. Zaccagnini also remembered testifying in court around October 2012.

Ms. Zaccagnini did not remember how the men were escorted out; when she realized that she still had the credit card, she brought it out to the front lobby in an attempt to return it to them. Once in the front lobby, however, she was asked to go back behind the bar, though she did not remember exactly who directed her to do that. Ms. Zaccagnini did not remember hearing "something bad happening outside," but recalled seeing a lot of police inside the club later on.

George Foreacre testified that he had known the decedent for about nineteen years. He stated that he and the decedent went to Oasis on October 16, 2009, to watch the Phillies game. Before going to Oasis, they spent some time at Couches Bar and Grill, a sports bar in Essington, Pennsylvania.

Mr. Foreacre noted that he and the decedent had been at Oasis a number of times in the past and that they knew some of the people who worked there. Upon arrival that day, they went to the back of the club and sat at the bar, where they remained for about an hour. Mr. Foreacre confirmed that he saw [Appellant] in the bar.

Mr. Foreacre stated that he and the decedent were talking, drinking and watching the Phillies game. The decedent said hello to a girl named Kelly (who was a friend of the decedent's wife and a girlfriend of Mr. Robert Laflar, the club owner); she allegedly responded with an expletive. About half an hour later, Mr. Foreacre and the decedent had an interaction with [Appellant] when the latter sucker-punched Mr. Foreacre, who was standing at the bar, thereby causing him to fall. Mr. Foreacre remembered being choked, trying to keep his breath, and passing out (he believed someone named Tim choked him). His next memory was that he and the decedent were outside, in the parking lot in front of the club.

Mr. Foreacre stated that when he first saw the decedent, the latter was dialing 911. Mr. Foreacre recalled that as he was standing outside, in the parking lot, he noticed [Appellant] who was standing inside, in the club's entranceway; [Appellant] was surrounded by four or five bouncers. Mr. Foreacre recalled that

before he was hit inside the bar that day, no one had asked him or the decedent to leave.

Mr. Foreacre also noted that he called 911 as he was standing about 25-30 feet outside the building. While he was on the phone, there were people coming in and out; [Appellant] remained at the entranceway.

Mr. Foreacre remembered that he first saw Mr. Robert Laflar,[5] the owner of the establishment, whom he had seen on prior occasions, when Mr. Laflar pulled into the parking lot in his Humvee. Mr. Foreacre noted that Mr. Laflar pulled in "aggressively": driving very quickly then stopping very swiftly.

[5] Mr. Rob Leflar, the owner of Oasis, passed away several years following the incident.

According to Mr. Foreacre, upon arrival, Mr. Laflar walked up to Mr. Foreacre (who was trying to explain to him what had happened just before Mr. Laflar's arrival) and sucker-punched him, which circumstance caused Mr. Foreacre to fall to the ground. At that time, the individuals who were standing in the doorway entrance, "Jack [Appellant], Rob [Mr. Laflar], Tim, Brendon" and "one other individual," immediately came out from the doorway entrance and started kicking and punching him.

Eventually, Mr. Foreacre was able to run toward Essington Avenue. He recalled that the decedent was standing at the back of the owner's vehicle and that someone was preventing him from being able to get to Mr. Foreacre.

Mr. Foreacre stated that once on Essington Avenue, he turned around to make sure that nobody was chasing after him. It was at that moment that he saw the decedent lying motionless on the ground. Mr. Foreacre came over to the decedent and tried talking to him, to no avail, as the decedent, who was bleeding from his head, was unresponsive. Mr. Foreacre noticed that the decedent's cell phone and credit card were placed on his chest.

Within seconds, the police arrived. Mr. Foreacre explained that earlier, both he and the decedent called 911. The Assistant District Attorney played for the jury the recordings of the two 911 phone calls; Mr. Foreacre confirmed that the voices on the recordings were his and the decedent's.

Mr. Foreacre also reviewed and commented on additional video recordings played in court for the benefit of the jury; the video spanned the period of time from the moment Mr. Foreacre was being choked inside the bar until the arrival of the police.

Mr. Foreacre stated that neither he nor the decedent was trying to go back inside the club. He recalled "saying stuff" to the individuals standing inside the entryway, including [Appellant]. However, he could not recall his exact words.

Mr. Foreacre was still at the scene when the ambulance arrived to take the decedent to the hospital; thereafter, he was taken to a police station. He recalled being taken to Mercy Hospital directly from the police station, as he was suffering from severe pain in his chest, back and neck. Mr. Foreacre remained for a day in the hospital where they attended to his "broken sternum and four or five transverse processed bone[s] in [his] back."

Mr. Foreacre recognized the statement which he gave to the detectives while at the hospital and confirmed signing each page of the statement. He also recalled that on November 4, 2009, he spoke with Detective Peters at Homicide.

Mr. Foreacre was shown his photograph taken at the hospital and confirmed that the photo accurately and fairly depicted the injuries he suffered as a result of the incident. Mr. Foreacre denied having any physical contact with [Appellant] or anyone else while he was at Oasis; he also noted that the decedent never touched, assaulted or hurt anyone.

Mr. Foreacre stated that after the incident, the decedent remained in a non–responsive condition. He indicated that he did not see who inflicted upon the decedent the fatal punch.

Mr. Foreacre stated that when he was running toward Essington Avenue after being hurt, he saw "Rob and Jack," the owner and [Appellant], standing by the decedent. By the time he turned back and ran toward the decedent, [Appellant] was walking toward the Oasis entrance; other individuals were also going back inside.

Under cross-examination, Mr. Foreacre acknowledged that in the parking lot, he was holding something that "look[ed] like a bottle" in his hand. He also acknowledged, that prior to the incident he had enough beers to be drunk and that in a prior proceeding, he told the judge that he, in fact, had six or seven beers. He further acknowledged that he had three to four beers at a different place

- 6 -

before arriving at Oasis and that the decedent was also intoxicated.

Mr. Foreacre, who confirmed that he was paying for his drinks with cash and that the decedent was using a credit card, noted that he had never before seen any paying customer getting removed from Oasis. He confirmed that he and the decedent were thrown out of Oasis for a reason other than non-payment.

Officer Alonzo Montes testified that on October 16, 2009, at about 6:15 pm, following receipt of a radio call, he and his partner, Officer Dowd (first name not provided), went to 6800 Essington Avenue. Officer Montes stated that once on location, he noticed a male (later identified as the decedent) lying down on the ground; he also saw another male (subsequently identified as Mr. Foreacre) standing by him.

The male on the ground was unresponsive; Officer Montes noticed heavy bleeding from the back of his head. Once Officer Montes realized that the decedent was "severely critical," he radioed for medics. Officer Montes recalled that the decedent's friend (who looked like he had been in a fight, with his shirt "almost ripped off") approached him and informed him that they had had "a fight with the owner of the club," with the decedent being "knocked out by one of the bouncers in the club."

Officer Montes also noted that the owner of Oasis, whom he later identified as Mr. Laflar, told him that he was at the gym when he received a phone call from his employees alerting him that two males were causing a disturbance at the club. Mr. Laflar arrived on location shortly thereafter. According to Mr. Laflar, once he exited his vehicle, the two males began fighting with him in an alleged attempt to steal his Rolex watch. Officer Montes made an observation that when he spoke with Mr. Laflar, the latter was wearing his watch and did not display any signs of injury. Officer Montes also noted that according to Mr. Foreacre, he and the decedent only wanted the decedent's credit card back but that the Oasis employees refused to return it to him.

Officer Montes also stated that when asked if there were any surveillance cameras inside the club, Mr. Laflar told him that the surveillance cameras were not working due to an incident which happened a few days before the incident in question.

Officer Montes indicated that the medics arrived on the scene and transported the decedent to the Hospital of University of

Pennsylvania (HUP). Officer Montes attempted to transport Mr. Foreacre to Southwest Detectives for an interview; however, Mr. Foreacre, who appeared to be "too much in pain," was taken to Mercy Hospital.

Officer Montes stated that he was subsequently interviewed by detectives about the incident and that his statement accurately reflected the circumstances as he had encountered them.

Officer Sean Elkins who was assigned to the Canine Unit testified that on October 16, 2009, he and his partner, Meghan Hartman, were directed to the location by their supervisor, Sergeant Davis (first name not provided), following a fight at the Oasis Gentleman's Club. Officer Elkins stated that upon arrival on location, he noticed a male laying on the ground on his back. There was blood underneath the male's head; blood was also coming from his ears. The male, who was unconscious, was taken to the hospital shortly thereafter. Officer Hartman accompanied him in the back of the ambulance, and Officer Elkins followed the ambulance in the police car.

After Officer Elkins left the hospital, he was directed by Sergeant Davis to return to Oasis to transport [Appellant] and another male (Edwin Padua) to Southwest Detectives for an interview. Officer Elkins indicated that at the time [Appellant] and Mr. Padua were transported to Southwest Detectives, they were not handcuffed and were not under arrest.

Officer Elkins explained that he met with [Appellant] and Mr. Padua at the Oasis office. He pointed out that he was at the club prior to the incident, the night before, and that at that time, the surveillance system was working.

Detective Dennis Slobodian of Southwest Detectives Division testified that he was assigned to the Oasis incident and that he went to the club at about seven o'clock in the evening. Detective Slobodian talked to Sergeant Davis and with some other officers on the scene.

Upon arrival, they had the club closed down, removed the patrons and required that the employees stay until interviewed; Detective Slobodian spoke with [Appellant] on location. According to the information Detective Slobodian received, the decedent and Mr. Foreacre attacked Mr. Laflar.

Detective Slobodian estimated that altogether, he interviewed about thirty staff members of Oasis and that some, including [Appellant] and Mr. Laflar, were taken to Southwest Detectives.

Detective Slobodian noted that when he arrived on the scene, he was told that the surveillance system was not operational because of the incident the night before. Detective Slobodian stated, however, that he could clearly see the DVR machines in the office, albeit with no monitors. He indicated that they subsequently contacted Detective James Dunlap and requested him to come out and inspect the digital recorder, DVR system, and camera system.

Detective Slobodian was still at the club office when Detective Dunlap arrived on location at about 11:00 pm. After Detective Dunlap succeeded in getting the system operational, Detective Slobodian watched some portions of the video showing what was going on outside the club, in the parking lot.

Detective Slobodian stated that, thereafter, he returned to Southwest Detectives and that at that point, the focus of his investigation changed as there was nothing to substantiate the story of "an assault and robbery on the owner."

Eventually, Detective Slobodian went to Mercy Hospital and took a statement from Mr. Foreacre, who also gave Detective Slobodian the decedent's credit card.[6] Detective Slobodian noted that upon the decedent's passing, the case was assigned to Homicide.

> [6] Detective Slobodian put the credit card on Property Receipt No. 2667690; the Property Receipt note indicated that the item was observed laying on the decedent's chest while the decedent was unconscious on the ground.

Detective Craig Fife of the Southwest Detective Division testified that he assisted Detective Slobodian with the investigation.[7] By the time they arrived on the scene, the injured individual had already been transported to the hospital where he was listed in critical condition. At that time, they were still investigating the decedent and Mr. Foreacre "as the aggressors in this incident."

> [7] Sergeant Davis and Officer Alonzo Mentes were already on location.

Detective Fife noted that when he asked [Appellant] (who was not a suspect at the time) whether there was surveillance footage available for the incident in the parking lot, [Appellant] responded

that the system had been removed earlier by the technicians who were servicing it because of the incident which occurred at the club the day before.

Detective Fife explained that upon investigation, one of the detectives determined that the DVR system for the video surveillance equipment was still on location and that the monitor had been removed. Thereafter, a search warrant was obtained; Detective Dunlap subsequently succeeded in retrieving video from the video system.

Detective Fife stated that he also spoke to [Appellant] at Southwest Detectives (Detective Slobodian was present for a big part of the interview). Prior to the interview, Detective Fife had already seen a "pretty good bit" of the video of the parking lot incident, which circumstance prompted the reversal of [Appellant's] role in the incident from a witness and a complaining witness to a suspect.

Prior to speaking with [Appellant], Detective Fife gave him **Miranda**[2] warnings; [Appellant] signed and dated the relevant paperwork, which was timestamped 10/17/09, 2:12 am. According to Detective Fife, at the time they spoke, [Appellant] was not in any pain or discomfort and was not under the influence of drugs or alcohol.

During the interview, [Appellant] stated that he was punched in the face and head during the altercation (which started in the bar and then continued in the parking lot) and that his nose was bleeding and sore; he indicated that his forehead and ear were also sore. [Appellant] stated that the altercation was over "basic disruptiveness" and that as they were watching the Phillies game, "the two men were being very loud, slapping each other, and pushing each other intimidating other customers." He noted that after the males were escorted outside, they stood outside the premises "provoking [Appellant] and the other bouncers and telling [Appellant] that they wanted [him] to fight one-on-one." [Appellant] explained that after the owner of the club arrived on location and exited his vehicle, these two individuals started to assault him; he noted that the decedent knew the owner from the past "and they had a history."

---

[2] **Miranda v. Arizona**, 384 U.S. 436 (1966).

In his statement, [Appellant] further explained that he did not call 911 but that he instead reached out to Sergeant Davis to complain about the altercation. Addressing the circumstance that the decedent was knocked unconscious, he stated:

> All I knew is that I pushed Jimmy [(the decedent)] away from Rob [Laflar] and Jimmy threw a punch at me. I don't know if I knocked him to the ground, because I got punched by the other guy, and I was dazed for a couple seconds. That is when Rob told me that the police were here and told everybody to go inside.

[Appellant] also explained that after the altercation was over, he went back inside to resume his managerial duties as he "had a lot of work to do." [Appellant] denied seeing anyone remove any of the surveillance equipment from the office area in the club. He added that he was sorry for what had happened but noted that he felt that the actions he took were in self-defense and that he "didn't mean for anyone to get hurt."

Detective Fife stated that [Appellant] signed and dated each page of his statement (which was timestamped at '10/17/09, 3:30 am') after he reviewed it. Detective Fife remembered telling Detective Slobodian:

> [Appellant] stated that when he arrived at the club on that day, … the company who services the security equipment was on location downloading video from a separate incident that occurred a day prior. [Appellant] stated that he didn't see the equipment in the office, and stated that the company must have removed it.

Detective Fife acknowledged that [Appellant] was cooperative. He also noted that he was unaware of a shooting at the nightclub the night before.

Michelle Mazza testified that the decedent was her younger brother. She stated that she saw the decedent the weekend before the shooting. Ms. Mazza estimated that the decedent remained in the hospital for about two weeks and that he never regained consciousness.

Mr. Lawrence Breckow testified that in October 2009, he worked at ASG Security as a service technician, and that his role involved servicing, maintaining and accessing the closed circuit television

(CCTV) intrusion systems and fire protection systems. Mr. Breckow stated that Oasis was a client.

Mr. Breckow recalled that on October 16, 2009, he was dispatched to Oasis at about 2:00 or 2:30 pm to retrieve some video from an incident from the night before from a network video recorder (NVR) and digital video recorder (DVR).[8] At Oasis, Mr. Breckow came in contact with [Appellant], whom he had also seen on prior occasions.[9] Mr. Breckow indicated that [Appellant] looked "refreshed" to him but admitted that he did not have a present recollection of that circumstance from 2009. Mr. Breckow recalled that he subsequently spoke with Detective Dunlap about his service call to Oasis.

[8] On his service order, Mr. Breckow's "on–site" time was marked as 14:30 and "cleared time" as 16:00.

[9] Mr. Breckow explained that they serviced one of the NVRs from Oasis previously, that one of his service technicians came back and replaced the NVR and left the "loaner" NVR there, and that on October 16, 2009, Mr. Breckow retrieved the "loaner." He noted that their machine had already been reinstalled and that it was operating.

Detective Brian Peters (who initially testified on June 22, 2016) later was recalled and testified as to his interpretation of what appeared on the video as it related to the incident. The video played for the benefit of the jury showed the events as they unfolded inside and outside the Oasis club.

The video showed, *inter alia*, [Appellant's] punching Mr. Foreacre inside the club; the time displayed was 6:11:18 pm.[10] The video also showed the decedent coming over "to get involved in the skirmish." The video then showed Mr. Tim Carpenter of Oasis approaching and putting Mr. Foreacre in a chokehold. At 6:12:31, Mr. Foreacre was "prone on the ground." At 6:13:07, they were leading Mr. Foreacre out, with Mr. Carpenter and Mr. Edwin Padua and Brendon Davis and [Appellant] behind him. Thereafter the video showed Mr. Foreacre['s] being taken outside at 6:13:26. At 6:13:59 pm, [Appellant] was shown making a phone call. At 6:19:48, the video showed Ms. Zaccagnini bringing the credit card to the vestibule. At 6:20:14, the video showed Robert Laflar entering the club.

[10] As noted by Detective Peters, there was a discrepancy between the video timestamps and real time. For ease-of-

reference purposes, this court cites the time as marked on
camera A.

Detective Peters then reviewed the recording off camera 3
positioned outside, "on the end of the building facing east," as well
as camera 2 "from the parking lot." The video showed
[Appellant's] hitting the decedent. The video then showed Mr.
Padua['s] throwing the decedent "further into the street"; beyond
Mr. Padua, the video showed [Appellant].

Thereafter, the decedent appeared to be pulling out his cell phone;
according to Detective Peters' chart, he was calling 911 at
6:12:47. At 6:13:26, the video showed Mr. Foreacre coming out
of the club. Thereafter, both Mr. Foreacre and the decedent were
standing on the far side of the parked cars.

Detective Peters stated that neither the decedent nor Mr. Foreacre
made an attempt to go back inside the club. The video thereafter
showed the two men standing in the parking lot and Mr. Laflar
pulling up in his car at 6:20:30. At 6:20:37, the video showed
Mr. Laflar as well as Edward Freinha, [Appellant], Timothy
Carpenter and Brendon Davis outside. At 6:20:38, the video
showed Mr. Foreacre talking to Mr. Laflar and motioning his left
hand upwards, away from Mr. Laflar. At 6:20:40, the video
showed how "Mr. Laflar smacks Mr. Foreacre in the face."

Meanwhile, the decedent was still standing in the parking lot and
talking on the phone. After Mr. Foreacre was hit, he moved toward
the rear of Mr. Laflar's Hummer, as Mr. Freinha and [Appellant]
were following him. From the other angle, the video showed Mr.
Foreacre['s] running away. At 6:21:48, the video showed the
decedent['s] standing to the right of [Appellant]; the decedent
was raising his hands up elevating them alongside his body.

At 6:22:17, [Appellant] struck the decedent; the video then
depicted the decedent "prone on the pavement." At 6:22:23 or
6:22:24, the video showed [Appellant's] walking back into the
club with Mr. Freinha, Mr. Kerzner and Mr. Padua following him.
The video then showed [Appellant's] walking into his office, then
looking at the security monitor along with Mr. Cesar Gramenzi of
Oasis and Karen Kozak, his fiancée, who was at the club that
evening.

After Mr. Gramenzi unhooked the monitor, the video showed
[Appellant's] walking around to the location of Mr. Gramenzi's

- 13 -

chair after Mr. Gramenzi took the monitor.  At 11:16:48, the video showed Detective Dunlap standing at the desk.

Detective Peters stated that [Appellant] did not call 911 but that he made multiple direct phone calls to Sergeant Davis instead.

Detective Peters noted that he could not say what the last thing was that Mr. Foreacre said inside the club before being hit.  He also noted that while there was a part on the video which showed Mr. Foreacre['s] holding a bottle, he was "not breaking it off or threatening anybody."  He was not holding a bottle in his hand when he was thrown out of the club; Detective Peters opined that he must have picked up the bottle while outside.

Under cross-examination, Detective Peters acknowledged that the decedent was raising his arms swiftly up and down toward his shoulders.  Q: Isn't it a fact, sir, that [the decedent] was going like this, like this, "Come on?"  A: That is what I see. The following exchange occurred moments later:

Q. Okay. Continue to play it. Right now [his] arms are in front of him.  Correct?

A. Yes.

Q. [Appellant] and him are sizing each other up.  Correct?

A. I don't think this is a fair question.

Q. Stop.  What is not fair about it?

A. You're asking me to say what they're doing.  How can I – what these guys are doing, if they're sizing each other up or squaring off?  I really don't think I can give you a yes or no.  I am trying to be fair.

Q. When I say they're squaring off against each other, getting ready to fight, you don't know, do you?

A. I do not know.

Q. Continue.  [The decedent] goes down.  Correct?

A. Correct.

Q. One punch.  Correct?

A. Yes.

- 14 -

Moments later, Detective Peters stated, "I am on the witness stand, because [Appellant] punched [the decedent] and [the decedent] died from it. That is it."

The defense called Detectives Charles Boyle and Richard Bova. Detective Boyle, who retired from Philadelphia Police Department in 2008, testified that he believed that Homicide obtained the ability to videotape a defendant's statement "sometime in the late nineties." Detective Boyle confirmed that as of 2009, he was not working in the Philadelphia Police Department and that he did not have direct knowledge of the conditions on the ground in the Philadelphia Police Department and their policies in 2009. He also confirmed that in 2008, when he left the Homicide Unit, divisional detectives did not have the ability to videotape.

Detective Richard Bova, who retired from the Philadelphia Police Department in 2006, also confirmed that Homicide had the equipment and the ability to videotape a defendant's statement as of 1999 or early 2000 but noted that when he was a divisional detective, that ability was not available. He also indicated that as someone who retired in 2006, he would not be intimately familiar with the conditions on the ground in 2009.

### *Expert Testimony*

### **Testimony of Detective James Dunlap, an Expert in the Field of Forensic Video Technology and Recovery of Video and Extraction of Digital Imaging**

Detective James Dunlap testified as an expert in the field of forensic video technology and recovery of widen and extraction of digital imaging.

Detective Dunlap stated that on October 16, 2009, he received a phone call from Southwest Detectives regarding the incident. Detective Dunlap was asked to respond and check to see if … Oasis'[s] surveillance system was operating at the time of the incident and recover any video associated with it.

Detective Dunlap arrived on location between 10:30 and 11:00 pm; by that time, the building had been secured and a search warrant obtained.[11]

---

[11] [Commonwealth] of Pennsylvania search warrant 146003 specified search of two Honeywell DVRs, model HRHD I6C320; it also provided the serial numbers for both DVRs.

Once in the office, Detective Dunlap noticed that on one of the desks, there were "two Honeywell model HRHD … digital video recorders; two 16–channel recorders. They had 32 camera inputs going into the back and they were sitting on one of the desks." At the time he arrived on location, two 16-camera units were not operating. "All of the camera inputs were still connected to the imports in the back. Power sources were still plugged in…. There was no monitor attached to the system."

Detective Dunlap explained that after he turned the power back on, he took a monitor from one of the adjacent desks and hooked it back in; thereafter, he was able to view the video.

For the benefit of the jury, Detective Dunlap reviewed the photographs and the video taken in the Oasis office. He explained that the two DVRs were approximately "eight minutes, 13 seconds off from each other." Detective Dunlap, therefore, checked these times against each other and against real time, to ascertain that they had "the right time, the time frame of the incident."

Upon examining the system, Detective Dunlap concluded that the unit was powered down "at approximately 6:28 and 50 seconds [pm]." The unit was then powered back up by Detective Dunlap and started recording at 11:16:45 pm. Other than the 4 hours, 47 minutes and 55 seconds when it was not recording, "all of the video on the machine was intact."

Detective Dunlap indicated that on the night of October 16, they recovered 45-minute video blocks from Units A and B, from "20-plus cameras." Subsequently, additional video was recovered from the location.[12] He also indicated that they secured the DVRs so that they could have unlimited time to investigate and recover any additional video if necessary[.]

[12] Later on, Detective Peters, who was the assigned detective, obtained another search warrant for Detective Dunlap to recover additional timeframe from that night, as well as the video from the previous day.

One of the videos showed [Appellant's] disconnecting the monitor associated with the two DVRs at 6:28:21 pm. The video then showed [Appellant's] getting on his knee right by the power switches which were under the desk; at that point, the video stopped recording until Detective Dunlap turned on the power upon his arrival at the crime scene.[13]

[13] Detective Dunlap also indicated that after the monitor was powered down, nothing was erased from the hard drive video-wise. He explained that "the average machine holds seven to 14 days, in [his] experience."

**Testimony of Dr. Samuel Gulino, an Expert in the Field of Forensic Pathology**

Dr. Samuel Gulino, the Chief Medical Examiner for the City and County of Philadelphia, testified as an expert in the field of pathology and forensic pathology. Dr. Gulino stated that [the decedent] was pronounced dead at 6:11 pm on November 2, 2009 and that he wrote the autopsy report upon personally performing the autopsy of the decedent.

Dr. Gulino indicated that the decedent first suffered the injury which caused his death on October 16, 2009. Dr. Guilno noted that the decedent had surgery on his head; there was a large C-shape surgical incision on the right side of his head which was closed with surgical staples. Dr. Gulino indicated that underneath the incision, there was a large piece of skull bone removed by surgeons.

Dr. Gulino stated that there were two distinct areas of head injury. There was a skull fracture in the front part of the decedent's head. "[T]his consists of a, roughly V shape or L[] shape fracture that went up to the front part of his skull and then over toward the left side. And where those two came together, … the bone was actually pushed in by about five millimeters. We call it a depressed fracture." Dr. Gulino further explained that underneath the fracture there was an "epidural hematoma," a collection of blood in the space between the skull and the brain. Dr. Gulino concluded, based on his examination, that those fractures were sustained as a result of at least two separate impacts on the head of the decedent.

Dr. Gulino also explained that the fractures in the front "were coming together in a V," which allowed him to conclude that they were caused by a single impact.

Dr. Gulino stated that the depressed fracture could be caused by a fist. However, he noted, *inter alia*:

> Fists are made of flesh and bone. So in causing that kind of damage to the skull, I think it would be very difficult to not cause damage to the fist, as well. … I would be very

- 17 -

surprised if it did not also cause some damage to the person's hand.

Dr. Gulino acknowledged that the injury could be caused by the fist "holding an object that concentrated the force," like a roll of quarters, a ring on a finger, or brass knuckles. He also stated that this type of injury "requires a large amount of force being applied over a small area to both cause the fracture and push the bone in towards the brain." He acknowledged that just the injury to the front of the head could have killed the decedent.

Dr. Gulino explained that the fracture to the back of the decedent's skull came from a separate impact and that it, too, could have killed the decedent on its own.

Dr. Gulino concluded to a reasonable degree of medical certainty that the decedent died as a result of [blunt] impact trauma to the head and that the manner of his death was homicide.

### ***Stipulations***

It was stipulated by and between counsel that if Dr. Gulino were to testify additionally,[14] he would testify as follows: "Question: Doctor, do you have any evidence that it was brass knuckles or a roll of quarters from your examination? Answer: No. I saw no specific skin injuries, which would allow me to draw any conclusion about any sort of objects."

[14] Dr. Gulino testified on June 22, 2016.

Trial Court Opinion (TCO), 3/28/2017, at 1-23 (internal citations and some internal brackets omitted).

As mentioned above, on September 7, 2016, Appellant filed an untimely post-sentence motion from the judgment of sentence entered on August 25, 2016.[3] Subsequently, he filed a timely notice of appeal on September 13,

_____

[3] We acknowledge that Labor Day was on Monday, September 5, 2016; nevertheless, Appellant's post-sentence motion was due no later than Tuesday, September 6, 2016. **See** Pa.R.Crim.P. 720(A)(1) ("[A] written post-sentence motion shall be filed no later than 10 days after imposition of

2016, and timely complied with the trial court's instruction to file a Rule 1925(b) concise statement of errors complained of on appeal. The trial court thereafter issued a Rule 1925(a) opinion.

Presently, Appellant raises the following issues for our review:

A. Whether the evidence was insufficient as a matter of law to prove beyond a reasonable doubt that [Appellant] was [not] justified in his actions?

B. Whether the verdict was against the weight of the evidence?

C. Whether the court's charge of conspiracy was inconsistent with bills of information and the conduct originally charged?

Appellant's Brief at 5 (unnecessary capitalization omitted).[4]

First, Appellant asserts that "the evidence was insufficient to convict him of third degree murder and related charges where he was acting in self-defense when he punched the decedent." *Id.* at 14. Appellant insists that "he was punched in the face and head during the altercation by Mr. Foreacre and the decedent[,] and that his nose was bleeding and sore[, and] that his forehead and ear were also sore." *Id.* at 15-16. Moreover, he maintains that "the men wanted to fight him and he delivered a punch after he was threatened and attacked." *Id.* at 16.

At the outset, we acknowledge:

_____

sentence."); *see also* 1 Pa.C.S. § 1908 (explaining that, when computing time, "[w]henever the last day of any such period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation").

[4] We have reordered Appellant's issues for ease of disposition.

- 19 -

[O]ur applicable standard of review is whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the factfinder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. Additionally, when examining sufficiency issues, we bear in mind that: the Commonwealth's burden may be sustained by means of wholly circumstantial evidence; the entire trial record is evaluated and all evidence received against the defendant considered; and the trier of fact is free to believe all, part, or none of the evidence when evaluating witness credibility.

**Commonwealth v. Crabill**, 926 A.2d 488, 490-91 (Pa. Super. 2007) (internal citations and quotation marks omitted).

Appellant claims that the Commonwealth did not disprove that he was acting in self-defense pursuant to 18 Pa.C.S. § 505.[5]  **See** Appellant's Brief at 14-15.  This statute provides, in pertinent part:

**(a)** **Use of force justifiable for protection of the person.**-- The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

**(b)** **Limitations on justifying necessity for use of force.**—

***

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

---

[5] We note that, "[w]hen the defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving such a defense beyond a reasonable doubt."  **Commonwealth v. Rivera**, 983 A.2d 1211, 1221 (Pa. 2009) (citation omitted).

- 20 -

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S. § 505(a),(b)(2).

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, *see Crabill, supra*, we conclude that the Commonwealth disproved Appellant's self-defense claim beyond a reasonable doubt. *See Rivera*, 983 A.2d at 1221. As the trial court discerned:

The video of the incident … showed, *inter alia*, that it was [Appellant] who first sucker-punched Mr. Foreacre thereby knocking him off the bar stool, and then struck the decedent, who was thrown out of the club after he attempted to assist Mr. Foreacre.[17] The video subsequently showed both men standing in the parking lot, making no attempts to return to Oasis. Meanwhile, Mr. Laflar, the owner, arrived on location, and the video captured him hitting Mr. Foreacre in the face, contrary to [Appellant's] contention that it was Mr. Laflar who was attacked.

> [17] Mr. Foreacre was taken outside shortly thereafter. Before Mr. Foreacre was removed from Oasis, the video also showed an Oasis bouncer, Mr. Carpenter, putting Mr. Foreacre in a chokehold, followed by an image of Mr. Foreacre being "prone on the ground."

This court is firmly of the belief that [Appellant] escalated the situation when he left the entranceway, came to the parking lot, accompanied by several bouncers and Mr. Laflar, and went after the decedent and Mr. Foreacre, who, in fact, placed two phone calls to police prior to this further altercation.

…

- 21 -

> This court is satisfied that the facts and circumstances leave no room for doubt that [Appellant] was not justified in his actions. This court concludes that [Appellant] did not reasonably believe that he was in danger of death or serious bodily injury or that he acted in defense of another. As the Commonwealth noted, "The entire time that this is going on … [Appellant] is clearly surrounded by four, five, six big guys. It is a six-to-one advantage during the entire incident."
>
> Furthermore, [Appellant] displayed consciousness of guilt when he disconnected the monitor from the video equipment and turned the equipment off, thereby making an attempt to tamper with the evidence, and subsequently lied about his actions.

TCO at 29-30 (internal citations and brackets omitted).

The above-stated evidence demonstrates that Appellant's use of force was not immediately necessary for the purpose of protecting himself against the use of unlawful force by the decedent. Further, it shows that Appellant provoked the incident, and he could have retreated safely into the club, yet chose to go outside the club to incite more violence. Thus, no relief is due.

Second, Appellant argues that the verdict was against the weight of the evidence. Initially, we must discern whether Appellant properly preserved this claim.

> Pennsylvania Rule of Criminal Procedure 607(A) provides:
>
> (A) A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:
>
> > (1) orally, on the record, at any time before sentencing;
> >
> > (2) by written motion at any time before sentencing; or
> >
> > (3) in a post-sentence motion.

Pa.R.Crim.P. 607(A).

Appellant has not identified where he preserved his weight claim pursuant to Rule 607(A). **See** Pa.R.A.P. 2117(c) (requiring statement of place of raising or preservation of issues). Further, our cursory review of the record does not reveal that Appellant raised this issue below, either before sentencing or in a post-sentence motion. Instead, it appears that he advanced it for the first time in his Rule 1925(b) statement. Thus, we deem it waived.

Notwithstanding, even if Appellant had properly preserved his weight claim below, we would consider it meritless. For such claims, we apply the following standard of review:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.
>
> **Commonwealth v. Mucci**, 143 A.3d 399, 410-11 (Pa. Super. 2016), (quoting **Commonwealth v. Clay**, 619 Pa. 423, 64 A.3d 1049, 1054-55 (2013)). To successfully challenge the weight of the evidence, a defendant must prove the evidence is "so tenuous,

vague and uncertain that the verdict shocks the conscience of the court." **Mucci**, 143 A.3d at 411 (quoting **Commonwealth v. Sullivan**, 820 A.2d 795, 806 (Pa. Super. 2003)).

**Commonwealth v. Windslowe**, 158 A.3d 698, 712 (Pa. Super. 2017).

Here, Appellant contends that the verdict was against the weight of the evidence because Mr. Foreacre — the Commonwealth's only eyewitness to the incident — was unreliable. **See** Appellant's Brief at 9. Specifically, he claims that Mr. Foreacre was intoxicated at the time, and understated his and the decedent's role in exacerbating the situation or striking back at the bouncers. **See id.** at 12. Moreover, Appellant baldly states that "[t]he testimony of the medical examiner supported [his] version of events." **Id.** at 12-13.

We would reject these arguments. The security video belies Appellant's allegation that Mr. Foreacre was unreliable, and that he and the decedent were responsible for escalating the situation. Furthermore, we note that the medical examiner's testimony supports the Commonwealth's version of events. **See** Commonwealth's Brief at 12 (noting that the medical examiner's testimony corroborated the Commonwealth's evidence that the decedent "suffered a fractured skull from [Appellant's] punch and another fracture from the fall to the ground, an epidural hematoma from the fractures, a coma and finally death") (citation omitted). Thus, even if properly preserved, we would not conclude that the trial court abused its discretion in denying Appellant's weight claim.

Finally, Appellant argues that "[t]he [c]ourt's charge on conspiracy was inconsistent with bills of information and the conduct originally charged."

Appellant's Brief at 17 (unnecessary emphasis omitted). According to Appellant, "the bills of information reflected a general conspiracy[,]" while the court charged the jury on conspiracy to commit third degree murder. *See id.* Consequently, he asks us to reverse his conviction of conspiracy to commit third degree murder due to this "procedural defect." *Id.*

Appellant has waived this claim for multiple reasons. To begin, as the trial court noted, Appellant's own attorney requested a more specific conspiracy charge:

> [Appellant's attorney]: Judge, I have an objection to the verdict sheet because it just says "conspiracy[,"] it doesn't say the object of the conspiracy.
>
> THE COURT: So, you think it should be "conspiracy to commit murder." That's what I understand you wanted. How do you feel about that?
>
> [The Commonwealth]: I don't -- I don't object, as long as it says, "third degree[."] I think the Jury charge is going to be clear as long as the Jury charge --
>
> THE COURT: Yes, well, my charge -- I'm pretty sure it is clear from my jury charge, but we'll put "Conspiracy to commit third degree murder."
>
> [Appellant's attorney]: Yes, that's fine.

N.T. Trial, 6/29/2016, at 125-26. Because Appellant himself requested the more specific conspiracy charge, he cannot now complain because he received that very relief.

Further, this issue is doubly waived as Appellant also fails to develop this argument in his brief. *See* Pa.R.A.P. 2119(a) ("The argument shall be … followed by such discussion and citation of authorities as are deemed

pertinent."). In support, he baldly refers to (and incorrectly cites) certain rules of criminal procedure, and does not present any case law or pertinent discussion to back his claim. ***See*** Appellant's Brief at 17.

In any event though, even if not waived, we would determine that this argument has no merit. Appellant does not explain why or how the more specific conspiracy charge prejudiced him. The record does not reveal, nor does Appellant argue, that he was unaware that the conspiracy charge related to third degree murder and/or that his defense was impaired in some way as a result. ***See Commonwealth v. Kelly***, 409 A.2d 21, 23 (Pa. 1979) ("Variations between allegations and proof at trial are not fatal unless a defendant could be misled at trial, prejudicially surprised in efforts to prepare a defense, precluded from anticipating the prosecution's proof, or otherwise impaired with respect to a substantial right.") (citation omitted). In addition, the Commonwealth persuasively argues that the indictment, both by the order of the counts and the degree of felony, indicated that the felony conspiracy at issue regarded the murder of decedent. ***See*** Commonwealth's Brief at 22. Thus, we would reject this claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/5/18

- 26 -