J-S28025-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DANIEL EDWARD CARABALLO | : | |
| | : | |
| Appellant | : | No. 1796 MDA 2024 |

Appeal from the Judgment of Sentence Entered August 21, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0000007-2022

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY OLSON, J.:                  **FILED: OCTOBER 7, 2025**

Appellant, Daniel Edward Caraballo, appeals from the judgment of sentence entered on August 21, 2024, as made final by the denial of Appellant's post-sentence motion on November 13, 2024.  We affirm.

The trial court ably summarized the underlying facts of this case:

> In June [] 2021, Daymion Neblett was living with his wife, children, and brother-in-law, Jermaine Gould [(hereinafter "the Victim")].  . . .  Mr. Neblett and Cheryl Caraballo, Mr. Neblett's neighbor and the mother of [Appellant], had a history of noise complaint[] issues.  Police were called in April, May, and June of 2021 to respond to these noise complaints that involved Barry Peters, a former resident in Mr. Neblett's home, and Michael Caraballo, the brother of [Appellant].  These incidents involved verbal yelling and aggression, but they did not become physically violent.  Ms. Caraballo told [Appellant] . . . about the noise complaint incidents.
>
> On June 25, 2021, Cheryl Caraballo drove her son Michael Caraballo to Planet Fitness.  The [Victim] was on their shared front porch when she arrived home.  Ms. Caraballo gave [the

Victim] a cigarette and went inside her home. Minutes later, she heard a loud bang and called 9-1-1. Around the same time, Mr. Neblett was sleeping on his couch near his front door. Mr. Neblett was awoken by the sound of gunshots. The [Victim] came into the home through the front door, said "they shot me," then collapsed to the floor.

Harry Witman, a neighbor, was outside helping another neighbor with his vehicle. Mr. Witman heard three gunshots. He looked towards the sound of the gunshots and saw an individual wearing black clothing running towards the Rise Medical Marijuana Dispensary. Mr. Witman did not see any other people or vehicles around at the time. Upon reviewing his video home surveillance footage, a silver vehicle drove up the wrong way on their neighborhood street and circled the block twice.

Officers Scott Shaeffer and Angel Diaz arrived on scene after being dispatched for a report of shots fired. Upon arrival, they found the [Victim] sitting up with his back against a couch, unresponsive. The officers attempted to render aid until EMS arrived. Officer Diaz observed two holes near the rear upper right and left waistband area of the [Victim's] body that appeared to be from gunshots. EMS arrived and transported the [Victim] to a hospital where he was pronounced [dead]. . . .

Following EMS' arrival, the officers reviewed the scene for evidence. Officer Shaeffer located one [cartridge] casing on the sidewalk and two [cartridge] casings underneath a vehicle. A 9mm spent projectile was located near the front door that was moved by police because it was in a heavy area of traffic.

Chief William Shaub was called in as the lead investigator in this case. Upon arrival on scene, Chief Shaub canvased the neighborhood to see if anybody was outside at the time of the shooting or if anybody had video footage. He spoke with Mr. Witman who stated that he saw an individual dressed in black running down the street towards the Rise Medical Marijuana Dispensary. Rise [Dispensary] management provided Chief Shaub with video footage that showed an individual in a silver Jeep Patriot driving into their parking lot, exiting the vehicle, then running back to the vehicle to drive

away. Chief Shaub recognized the individual in the video as one of the "Caraballo boys" and believed it might be Michael Caraballo, [Appellant's] brother. Chief Shaub took steps to rule out Michael Caraballo as a suspect in this case. Chief Shaub interviewed Ms. Caraballo who stated that Michael Caraballo did not drive and that she took him to Planet Fitness that night. She further explained that Michael went to his mentor's home after he left Planet Fitness then went to a garage gym for semiprofessional wrestling. Chief Shaub confirmed this sequence of events by reviewing records at Planet Fitness, Michael Caraballo's mentor, and video footage near the garage gym. Ms. Caraballo then mentioned to Chief Shaub that her other son, [Appellant], had a silver Jeep Patriot. When asked about [Appellant's] living arrangements, Ms. Caraballo confirmed that [Appellant] was living at Keystone Community Center at the time of the shooting.

Amanda Price, an employee of Keystone Correctional Services Incorporated, testified that [Appellant] was a resident at Keystone Community Center in June of 2021. Ms. Price testified that residents have the freedom to leave the center to go to work, but that they were expected to leave and return at specific times. Residents of the center use a computer system to check in and out of the center. Video surveillance footage, provided to Chief Shaub for review, showed [Appellant] leaving the center on June 25, 2021, at 2:22 p.m. wearing a red shirt and a Phoenix Sun's hat. [Appellant] was expected to return to the center by 1:45 a.m. the next morning, June 26, 2021, however, [Appellant] returned to the center at 1:45 p.m. on June 26, 2021. On June 25, 2021, Keystone Community Center was notified that [Appellant] was involuntarily terminated from employment at FreeBird.

Upon reviewing and comparing the video footage from Keystone Community Center and Rise Dispensary, Chief Shaub noted that the individual in the Rise Dispensary footage, running away from the shooting, was wearing work boots, jeans, a Phoenix baseball hat, a mask with long strings that hung towards the individual's chest, and had a unique hairline cutout. The footage from Keystone Community Center showed [Appellant] leaving the center on the day of the shooting wearing the same work boots, jeans, Phoenix

- 3 -

baseball hat, and mask with long strings. [Appellant] was also depicted in the Keystone footage with the same unique hairline cutout as the individual in the Rise Dispensary footage. Chief Shaub also matched [Appellant's] silver Jeep Patriot from the Keystone footage to the silver vehicle used by the individual in the Rise Dispensary footage. Chief Shaub confronted [Appellant] with this information using still pictures from the footage and [Appellant] became irate, claiming that the footage from Rise Dispensary must be doctored because he was not in town that day.

Jade Gusler, who was dating [Appellant] at the time of the shooting, testified that [Appellant] came to her home on June 25, 2021, and appeared shaken. [Appellant] was also wearing her clothing, a maternity shirt and capris. Ms. Gusler gave a recorded statement to police on August 5, 2021. Ms. Gusler initially testified that she did not remember what she told police regarding her conversation with [Appellant] on the day of the shooting. When presented with her recorded statement, she testified that she remembered telling police that [Appellant] told her to say that they were together on the day of the shooting watching a movie and having sex. Ms. Gusler also testified that she could not clarify when things happened because of her brain injury and prior drug use.

Doctor Wayne Ross, a forensic pathologist, performed the autopsy on the [Victim] on June 29, 2021. Dr. Ross determined that one gunshot entered through the [Victim's] right buttock and exited through his right hip area. The second gunshot entered through the [Victim's] buttock area, traveled into his abdomen, went through his stomach and diaphragm, then exited through his upper body. Dr. Ross determined that both gunshot wounds caused significant blood loss in the [Victim's] buttock area and his abdomen, leading to hemorrhagic shock and hypotension that ultimately led to the [Victim's] death. Dr. Ross further determined that the cause of death [was] gunshot wounds to the body and the manner of death [was] homicide.

Trial Court Opinion, 3/12/25, at 2-6 (citations omitted).

A jury found Appellant guilty of first-degree murder, persons not to possess firearms, and discharge of a firearm into an occupied structure.[1] *See* N.T. Jury Trial, 5/20-21/24, at 387 and 392. On August 21, 2024, the trial court sentenced Appellant to serve a term of life in prison for his first-degree murder conviction and to serve an aggregate, consecutive term of seven to 14 years in prison for the remaining convictions. N.T. Sentencing, 8/21/24, at 8.

Appellant filed a timely post-sentence motion, where he claimed that the jury's verdict was against the weight of the evidence. *See* Appellant's Post-Sentence Motion, 8/22/24, at 3. The trial court denied the motion on November 13, 2024 and Appellant filed a timely notice of appeal. Appellant raises two issues on appeal:

> [1.] Did the [trial] court abuse its discretion by erroneously allowing the use of a prior statement as an inconsistent statement when there was not a finding that the declarant's lack of memory was credible and the declarant only stated that she did not remember the prior conversations?
>
> [2.] Did the [trial] court abuse its discretion in denying [Appellant's] motion for arrest of judgment?

Appellant's Brief at 6.

Appellant first claims the trial court erred when, during Jade Gusler's testimony, the trial court admitted a prior inconsistent statement that Ms. Gusler made during a police interview.

---

[1] 18 Pa.C.S.A. §§ 2502(a), 6105(a)(1), and 2707.1(a), respectively.

Appellant's claim challenges the trial court's evidentiary ruling. We have explained:

> Our standard of review for a trial court's evidentiary rulings is narrow, as the admissibility of evidence is within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill will or partiality, as shown by the evidence of record.

*Commonwealth v. Melvin*, 103 A.3d 1, 35 (Pa. Super. 2014) (citations omitted). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa. Super. 2012) (quotation marks and citations omitted).

During Appellant's trial, the Commonwealth called Appellant's former girlfriend, Jade Gusler, as a witness. Ms. Gusler testified that, on June 25, 2021, she ran home from work after learning Appellant was in her house. *See* N.T. Jury Trial, 5/20-21/24, at 220-224. As is relevant to the current claim, she testified as follows:

> [The Commonwealth]: Okay. Can you tell us [] what [Appellant's] demeanor was like when you saw him there at the house?
>
> [Ms. Gusler]: He just seemed, like, really [shaken] up. Like, he had intentions of surprising me and spending the evening with me. And I kind of ruined it because I came home.
>
> [The Commonwealth]: Okay. Did he say anything to you?

[Ms. Gusler]: I mean, he was happy I was home; but I mean, no, not really, no.

[The Commonwealth]: He didn't say – make any statements to you that – that evening?

[Ms. Gusler]: He took me to Sheetz to get cigarettes. I mean . . .

*Id.* at 225.

The Commonwealth initially attempted to refresh Ms. Gusler's recollection of the events by allowing her to read a transcription of her August 5, 2021 police interview. *See id.* at 225-226. Ms. Gusler, however, testified that the transcript did not "refresh [her] recollection . . . to what [she] told officers [on August 5, 2021]." *Id.* at 226. Over Appellant's objection,[2] the following testimony was then elicited:

_____

[2] The basis for Appellant's contemporaneous objection was not transcribed. *See* N.T. Jury Trial, 5/20-21/24, at 227. Nevertheless, at the end of Ms. Gusler's testimony, a sidebar was held where the following took place:

[Trial Court]: You wanted to make an objection?

. . .

[Appellant's Counsel]: Yes, Your Honor. So the first objection that we had addressed at sidebar was the fact that we were objecting to [the Commonwealth] – what I thought they were going to do was play the video. It ended up being that they read off of the transcript; but the objection when they asked – they tried to refresh Jade's recollection as to what she said during her [police] interview. She said she did not remember. They allowed her to read it; and then when she did not remember, they came forward and actually read to her the transcript for impeachment purposes. We objected at [sidebar] for that. Your Honor overruled our objection and allowed it to go forward.

*(Footnote Continued Next Page)*

[The Commonwealth]: Jade, going back to the day that you were interviewed [by the police,] August 5[, 2021,] do you remember a detective asking you what you and [Appellant] spoke about that evening?

[Ms. Gusler]: No.

[The Commonwealth]: Do you remember telling police that he came to pick you up and told you, like, five times, if I ever get investigated for this situation to tell them you were with me; that he was . . . with me within the hours of 5:30 and 11:30; and we were watching a movie and having sex? Do you remember telling detectives that day?

[Ms. Gusler]: Yeah, kind of.

[The Commonwealth]: You do?

[Ms. Gusler]: Yeah.

*Id.* at 227-228.

On appeal, Appellant claims that the trial court erred when it admitted Jade Gusler's prior statement that, on the day of the shooting, Appellant told her: "if I ever get investigated for this situation to tell them you were with me; that he was . . . with me within the hours of 5:30 and 11:30; and we were watching a movie and having sex." *See id.*; *see also* Appellant's Brief at 18. Appellant's claim fails.

In relevant part, Pennsylvania Rule of Evidence 613(a) provides: "A witness may be examined concerning a prior inconsistent statement made by the witness to impeach the witness's credibility." Pa.R.E. 613(a). Our

_____

N.T. Jury Trial, 5/20-21/24, at 233-234.

- 8 -

Supreme Court has "held that the admission of a prior inconsistent statement of a non-party witness shall be used as substantive evidence only when: (1) the statement was given under oath at a formal legal proceeding; or (2) the statement is reduced to a writing signed and adopted by the declarant; or (3) the statement is recorded verbatim contemporaneously with the making of the statement." *Commonwealth v. Hanible*, 30 A.3d 426, 445 (Pa. 2011) (citation omitted). "[T]o be admissible as [a] prior inconsistent statement[] . . . the dissimilarities or omissions must be substantial enough to cast doubt on a witness's testimony." *Commonwealth v. Bailey*, 469 A.2d 604, 611 (Pa. Super. 1983); *Commonwealth v. Luster*, 71 A.3d 1029, 1043 (Pa. Super. 2013) (*en banc*) (same); *see also Commonwealth v. Rayner*, 153 A.3d 1049, 1062 (Pa. Super. 2016) (an inconsistency exists when the earlier statement is "incompatible with the witness's trial testimony").

According to Appellant, the trial court erred in admitting Ms. Gusler's prior statement, as there was no "inconsistency" between her trial testimony and the statements she made during the August 5, 2021 police interview. Specifically, Appellant claims, the case at bar simply concerns "[a] good-faith lack of memory." *See* Appellant's Brief at 17. Appellant's claim is belied by the record.

As noted above, Ms. Gusler initially testified in the following manner:

> [The Commonwealth]: Okay. Can you tell us [] what [Appellant's] demeanor was like when you saw him there at the house?

> [Ms. Gusler]: He just seemed, like, really [shaken] up. Like, he had intentions of surprising me and spending the evening with me. And I kind of ruined it because I came home.
>
> [The Commonwealth]: **Okay. Did he say anything to you**?
>
> [Ms. Gusler]: **I mean, he was happy I was home; but I mean, no, not really, no**.
>
> [The Commonwealth]: **He didn't say – make any statements to you that – that evening**?
>
> [Ms. Gusler]: **He took me to Sheetz to get cigarettes. I mean . . .**

N.T. Jury Trial, 5/20-21/24, at 225 (emphasis added).

Thus, according to Ms. Gusler's initial trial testimony, when she saw Appellant on the day of the shooting, Appellant did not "say anything" to her. *See id.* The Commonwealth then proffered – and the trial court admitted – Ms. Gusler's prior statement that Appellant, in fact, told her the following on the day of the shooting: "if I ever get investigated for this situation to tell them you were with me; that he was . . . with me within the hours of 5:30 and 11:30; and we were watching a movie and having sex." *Id.* at 227-228.

The case at bar thus does not concern "[a] good-faith lack of memory."[3]

*See* Appellant's Brief at 17. Rather, it concerns an inconsistency between Ms.

---

[3] Indeed, Ms. Gusler's claimed "lack of memory" related only to what **she and the police** spoke about during her August 5, 2021 interview. *See* N.T. Jury Trial, 5/20-21/24, at 227-228 (Ms. Gusler initially answered "no" to the following question: "you were interviewed [by the police,] August 5[, 2021,] **do you remember a detective asking you what you and [Appellant] spoke about that evening**?") (emphasis added). Ms. Gusler never testified that her lack of memory related to whether Appellant "sa[id] anything to her" on the day of the shooting. As to this question, Ms. Gusler's initial trial
*(Footnote Continued Next Page)*

Gusler's initial trial testimony that, on the day of the shooting, Appellant did not "say anything" to her and her prior statement that, on the day of the shooting, Appellant told her: "if I ever get investigated for this situation to tell them you were with me; that he was . . . with me within the hours of 5:30 and 11:30; and we were watching a movie and having sex." *See* N.T. Jury Trial, 5/20-21/24, at 227-228. Appellant's first claim on appeal thus has no basis in fact and, as such, the claim necessarily fails.

Next, Appellant claims that the jury's verdict was against the weight of the evidence.

When considering a challenge to the weight of the evidence, our standard of review is as follows:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

---

testimony was that Appellant **did not say "anything" to her**. *See id.* at 225 (emphasis added).

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

***Commonwealth v. Windslowe***, 158 A.3d 698, 712 (Pa. Super. 2017) (quotation marks omitted). "[A]n abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the [trial] court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." ***Commonwealth v. Loughman***, 314 A.3d 569, 572 (Pa. Super. 2024) (quotation marks and citations omitted).

In his post-sentence motion, Appellant claimed that the "evidence identifying [Appellant] shocks the conscious and is unreliable when [Appellant] [was] never identified by any witnesses on scene and no firearm [was] ever found in the possession of [Appellant] nor [was] there any forensic evidence linking [Appellant] to this shooting." Appellant's Post-Sentence Motion, 8/22/24, at 3-4. The trial court rejected Appellant's claim, reasoning:

> During trial, the Commonwealth presented evidence in the form of video footage from Keystone Community Center, Rise Dispensary, and Mr. Witman, who is a neighbor of both the [Victim] and [Appellant]. The video footage from Keystone Community Center shows [Appellant] leaving on the day of the shooting in a silver Jeep Patriot and wearing work boots, jeans, a Phoenix baseball hat, and a face mask with long strings. Chief Shaub also noted that [Appellant] had a unique hairline with a cutout that could be seen in this video footage. . . .

Mr. Witman saw an individual wearing black clothing running towards the Rise Dispensary immediately after hearing the gunshots and his video footage showed a silver vehicle driving into their neighborhood and circling the block twice. The video footage from Rise Dispensary shows an individual arriving and parking a silver vehicle matching [Appellant's] vehicle. The footage goes on to show the same individual running back to the vehicle wearing the same work boots, jeans, Phoenix baseball hat, mask with long strings, and unique hairline as was shown in the footage of [Appellant] from Keystone Community Center. . . .

[Appellant] knew of the tense situation between his mother and her neighbors caused by several noise complaints. Considering the evidence presented to the jury, it is not so contrary to the guilty verdict that it shocks [the trial court's] sense of justice. Therefore, [the trial court] conclude[s] that the jury's guilty verdict is not against the weight of the evidence.

Trial Court Opinion, 3/12/25, at 8 (citations omitted).

We agree with the trial court's able explanation and conclude that it did not abuse its discretion when it denied Appellant's weight of the evidence claim.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/07/2025

- 13 -